**Mayerson & Hartheimer, PLLC**
Sandra E. Mayerson, Esq.
David H. Hartheimer, Esq.
845 Third Avenue, 11th Floor
New York, NY 10022
Tel: (646) 778-4380
Fax: (646) 778-4384
sandy@mhlaw-ny.com
david@mhlaw-ny.com

*Proposed Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>RM BAKERY LLC,<br>　　　　　　　Debtor. | Chapter 11<br><br>Case No. 20-11422 (MG) |
| In re:<br><br>BKD GROUP LLC, [1]<br><br>　　　Debtors. | Chapter 11<br><br>Case No. 20-11423 (MG) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363,
(II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361 AND
363, (III) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING
PURSUANT TO 11 U.S.C. §§ 105(a), 362 AND 364(c) AND (d), GRANTING SUPER
PRIORITY CLAIMS TO THE DIP LENDER PURSUANT TO 11 U.S.C. 364(c), (V)
MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING
PURSUANT TO BANKRUPTCY RULE 4001**

　　　　　　The above-captioned debtors and debtors-in-possession (collectively, the

---

[1]　　The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number
are as follows: RM Bakery LLC (7954) and BKD Group LLC (0642).

"Debtors"), by and through their undersigned proposed counsel, submit this motion (the "Motion") for entry of an interim order substantially in the form submitted herewith (the "Interim DIP Order"), and a final order (the "Final DIP Order" and together with the Interim DIP Order, the "DIP Orders"), pursuant to section 105(a) 361, 362, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"), (i) authorizing the Debtors' continued use of cash collateral pursuant to section 363 of the Bankruptcy Code; (ii) granting adequate protection for such use of cash collateral pursuant to section 361 and 365 of the Bankruptcy Code; (iii) authorizing the Debtors to obtain secured post-petition financing from FS Lender 2015 LLC (the "DIP Lender" or "Lender"), consisting of a revolving credit facility in the aggregate principal amount of up to $1.0 million (the "DIP Financing" or the "DIP Facility") for the purposes of funding the Debtors' general operating and working capital needs in the administration of the Debtors' Chapter 11 cases, in accordance with (a) that certain Debtor-in-Possession Credit and Security Agreement, dated July 15, 2020 (the "DIP Credit Agreement") substantially in the form attached to the Interim DIP Order as **Exhibit A**, between the Debtors in the DIP Lender and (b) the budget (the "Budget"), (iv) authorizing and approving the Debtors' entry into the DIP Credit Agreement and any other documents, certificates or instruments ancillary thereto, and performance of such other acts as may be necessary or appropriate in connection therewith, (v) granting to the DIP Lender valid, fully protected, and enforceable security interest and liens (collectively, the DIP Liens") in and upon the DIP Collateral (as defined in the DIP Credit Agreement) pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code; (vi) vacating and modifying the automatic stay to the extent necessary to effectuate the terms and provisions of the DIP Credit Agreement and the DIP Orders; and (viii) scheduling a hearing (the "Final Hearing") pursuant to Rules 4001(b)(2) and

2

(c)(2) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") to consider entry

of the Final DIP Order, authorizing and approving the DIP Financing and use of cash collateral

on a final basis.

In further support of this Motion, the Debtors rely upon the Declaration of Mark

Rimer in Pursuant to Local Rule 1007-2 and in Support of Debtors' Chapter 11 Petitions and

First Day Motions (the "<u>First Day Declaration</u>"), filed contemporaneously herewith, and

respectfully states as follows:

<u>**JURISDICTION, VENUE AND STATUTORY PREDICATES**</u>

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334 and the Amended Standing Order of reference from the United States District Court for

the Southern District of New Your, dated January 31, 2012. This matter is a core proceeding

within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362,

363, and 507 of the Bankruptcy Code, Bankruptcy Rules, 2002, 4001, and 9014 and Local

Bankruptcy Rule 4001-2.

<u>**BACKGROUND**</u>

**A.      General Background**

4.      On June 15, 2020, the Debtors each filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases

(collectively the "<u>Chapter 11 Cases</u>") in the United States Bankruptcy Court for the Southern

District of New York.

5.      The Debtors are operating their business and managing their property as debtors-

in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the filing

of this Motion, no request has been made for the appointment of a trustee or examiner and no

statutory committee has been appointed in the Chapter 11 Cases.

6.      RM Bakery, LLC ("RMB"), one of the debtors herein, is a wholesale artisanal

bread and pastry bakery in the Bronx that produces over 400 different breads and pastries. Prior

to the coronavirus pandemic, RMB had approximately 400 customers in the tri-state area,

consisting of hotels, restaurants, country clubs, and caterers. Products are made to order from

scratch every day and delivered fresh to customers. Prior to the coronavirus pandemic, this was

accomplished via a fleet of leased vehicles, as well as distributors. RMB has recently completed

the outsourcing of distribution to distributors and are terminating all vehicle leases and

ownership interests in order to reduce overhead. The business employed approximately seventy

hard-working bakers, packers, drivers and office staff, plus an additional twenty or so employees

in two of RMB's subsidiaries, RMB BONY LLC ("BONY") and Baked Wholesale LLC

("Wholesale LLC"). None of RMB's three subsidiaries are filing for protection pursuant to

chapter 11 at this time. The majority of the employees are residents of New York and are

ethnically diverse.  The Bronx-based bakery facility itself, as well as the residences of the

majority of the employees, are in an area that demographically shows very low income. RMB is

proud to give hard workers from the nearby area employment opportunities.

7.      Since the onset of the coronavirus pandemic most of RMB's customers have had

to close their doors, resulting in a 65% reduction in business. Because of this precipitous decline

in business, unfortunately RMP had to furlough many of its employees. It is the hope of these

Debtors, that through the restructuring and reorganization pursuant to these Chapter 11 Cases

4

as well as the Debtors' customers reopening their businesses, the Debtors will be able rehire many of these employees.

8.     A more detailed description of the Debtors' history and the facts surrounding the commencement of these Chapter 11 Cases is set forth in the First Day Declaration, which is incorporated herein by reference.

**B.     Organizational Structure**

9.     RMB is wholly-owned by BKD Group LLC ("BKD").  BKD has also filed for protection under Chapter 11, and simultaneous with this Motion, BKD and RMD filed a motion seeking to have their cases jointly administered. As will be discussed in more detail below, BKD guaranteed some of RMB's debt.

10.     RMB owes three wholly owned subsidiaries: RM Bony LLC ("Bony"), Baked Wholesale LLC ("Wholesale") and RM Bakery Manager, LLC ("Manager").  Bony and Wholesale are operating bakers and share the RMB baking facility. Manager is an unused entity with no operations. Neither Bony, Wholesale, nor Manager has sought bankruptcy protection at this time.

**C.     The Debtors' Prepetition Capital Structure**

**(i)     Prepetition Credit Documents**

(a)  Pacific Western Bank Credit Documents

11.     On or about May 2, 2013, the predecessor-in- interest to Pacific Western Bank ("Pac West"), Square 1 Bank (Square 1) made a loan to RMB, as borrower, in the original principal amount of $5,000,000 (the "Pac West Loan").  The Pac West Loan is authorized and approved by the U.S. Small Business Administration (the "SBA") pursuant to a written Loan Authorization of the SBA dated April 10, 2013, bearing SBA Loan # PLP6107185007 (the

"Loan Authorization"). The Loan is evidenced by a SBA Loan agreement, dated May 2, 2013 (the "Square 1 Loan Agreement"). The loan is further evidenced by a certain SBA Note, dated May 2, 2013, executed by RMB as borrower, to Square 1 Bank as original lender, in the principal amount of $5,000,000 (the "SBA Note").

12.     To secure its indebtedness under the SBA Note and Square 1 Loan Agreement, RMB executed a security agreement dated May 2, 2013, in which it granted to Square 1, a security interest in certain equipment, assets and property of RMB, specifically, the Accounts, Chattel, Paper, Instruments, Documents, Inventory, General Intangibles, Equipment, furniture, and Proceeds and Products thereof (collectively described as the "Pac West Pre-Petition Collateral").

13.     As a condition of the Pac West Loan, and to further secure its indebtedness, on May 2, 2013, certain affiliates of RMB provided a guarantee of RMB's indebtedness to Square 1 by entering into a written guarantee with Square 1 (the "Affiliate Guarantees"). On June 1, 2016, BKD also provided Square 1 with a written guarantee (the "BKD Guarantee").

14.     Effective October 6, 2013, Square 1 merged with and into Pac West, by which Pac West became the successor, by merger, of Square 1's rights as original lender under the Pac West Loan. Accordingly, Pac West is now the holder and owner of the SBA Note, Square 1 Loan Agreement, and the other loan documents.

15.     Square 1 and RMB, together with the guarantors, entered into an agreement entitled "Change in Terms Agreement" dated February 11, 2015. Pac West, as successor by merger to Square 1, on November 17, 2015 executed a consent pursuant to the terms and conditions thereto, Pac West consented to RMB's pre-payment of a promissory note.

16.     On June 1, 2016, RMB, as borrower, and Pac West, as lender, entered into a loan

6

modification agreement (the "Loan Modification Agreement"). Pursuant to the Loan Modification Agreement, the date of the loan was extended to May 1, 2026.

17.    As of the Petition Date, approximately $3,075,000 remains outstanding under the PAC West Facility (together with any amounts incurred or accrued, but unpaid prior to the Petition Date, the "Pac West Lien Obligations".) To secure the PAC West Obligations, RMB granted PAC West, first-priority security interest in and liens on [put in language from Pac West UCC] (collectively, the "Pac West Collateral").

(b)    The Mayrich Capital LLC Credit Documents

18.    In June 2017, RMB had the opportunity to enter into a revolving line of credit agreement with the predecessor-in-interest to Mayrich Capital, LLC ("Mayrich") North Mill Capital ("NMC"), secured with a first lien against RMB's accounts receivable, accounts, inventory and proceeds thereof, as well as substantially all of the Assets of BKD (other than BKD's choses in action) and certain equipment of Bony (the "Mayrich Facility"). RMB, as borrower, was a party to a promissory note entitled Revolving Credit Master Promissory Note, dated June 8, 2017, (the "Mayrich Note") pursuant to which NMC extended a secured revolving line of credit facility to RMB in the original of a maximum amount of 1.25 million dollars ($1,250,000). To secure its indebtedness under the Mayrich Note, RMB executed a security agreement also dated May 7, 2017, (the "Mayrich Loan and Security Agreement") in which RMB granted to NMC, a security interest in certain equipment, assets and property or RMB. Specifically, the Mayrich Loan and Security Agreement provides in pertinent part:

> *Collateral* means all of the following assets, properties, rights and interests of the Borrower, whether now owned or existing, or hereinafter acquired or arising: all Accounts, all Inventory, all General Intangibles relating (specifically and only) to Borrower's Accounts and Inventory (including, without limitation, all purchase orders, software and Borrower's Books),

all Supporting Obligations (specifically and only) with respect to the foregoing, all Deposit Accounts other than Excluded Deposit Accounts, all money or assets of Borrower, which hereinafter come into the possession, custody or control of Lender in connection with the foregoing Collateral; all proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing; any and all tangible or intangible property resulting from the sale, lease, license or other disposition of any of the foregoing, or any portion thereof or interest therein, and all proceeds thereof; and any other asset of Borrower or the Guarantor which may hereinafter be subject to a lien in favor of Lender as security for the Obligations.

(collectively the "Mayrich Pre-Petition Collateral").

19.     Without this funding, RMB would not have been able to survive. Accordingly, Pac West agreed to subordinate their lien to NMC on Accounts, Inventory, Deposit Accounts, General Intangibles related thereto, and Products and Proceeds thereof accounts receivable, accounts, inventory, and proceeds thereof through an inter-creditor agreement between NMC and Pac West also dated June 8, 2017 (the "Intercreditor Agreement"). NMC under the Intercreditor Agreement had a first lien on the above enumerated items (the Mayrich First Lien Collateral.") Also pursuant to the Intercreditor Agreement, Pac West agreed to put any past due principal payments to the end of the loan term.

20.     The Mayrich Facility has subsequently been sold and assigned to Mayrich, subject to the Intercreditor Agreement. Accordingly, Mayrich has a first lien on the Mayrich First Lien Collateral. Presently, the amounts Mayrich is owed (approximately $1,379,537) is not fully covered by this collateral. As a result, Pac West's second lien on inventory and accounts receivable is currently of no value.

(ii) <u>Other Secured Financing</u>

21.    <u>Machinery and Equipment</u>.  The Debtors are also parties to various other secured purchase money financing agreements with respect to machinery and equipment with ten (10) separate secured creditors on the purchase money financing facilities.

22.    <u>Security Deposit for Leased Facility</u>. RMB is a party to a sublease agreement with Kuzari Investor 27323 LLC ("KI")(a member of BKD), dated November 9, 2015 (the "Sublease Agreement").  Pursuant to the Sublease Agreement, RMB entered into a 10 year sublet of a 22,500 square foot banking facility with KI, which requires rent payments, which on the first year were $25,000 a month, increasing every year, to $32,619.33 on the 10th year (the "<u>Rent Payments</u>").  In order to secure the Rent Payment, RMB paid KI a $75,000 security deposit (the "Security Deposit"). KI now holds the Security Deposit and will continue to do so during the pendency of the Chapter 11 Cases.

(iii)    <u>Unsecured Credit Cards</u>

23.    <u>Chase Credit Cards</u>. As of the Petition Date, RMB is indebted to Chase Card Services on two credit cards issued by Chase Bank (the "Credit Cards").  RMB has used the Credit Cards to pay for certain operating expenses of the Debtors. The credit limit on the two Credit Cards are $25,000 (for its credit card account ending in 4454) and $65,000 (for its credit card account ending in 6461). As of the Petition Date, RMB has utilized $24,373.07 (for credit card account ending in 4454) and $71,755.34 (for credit card account ending 6461) and therefor RMB owes those amounts to Chase Card Services. Mark Rimer, the CEO of RMB is a guarantor of RMB's obligations on the Credit Cards.

(iv)    <u>Trade Debt</u>

24.     As of the Petition Date, the Debtors have aggregate unsecured debts totaling

approximately $10,499,179.40.    These amounts include, trade debt, amounts owed for professional services, utilities, insurance and employee-related expenses.

## NEED FOR USE OF CASH COLLATERAL
## AND POSTPETITION FINANCING

25.    The Debtors intend to use the Chapter 11 Cases to restructure their debt obligations and propose a feasible plan of reorganization. Pending the filing of the Chapter 11 plan, the Debtors intend to operate their business in the ordinary course by continuing to retain and pay their employees and provide an excellent product to their customers.

26.    The Debtors, however, do not have sufficient unencumbered cash or other assets to continue to operate their business during these Chapter 11 Cases or to effectuate a reorganization. The Debtors will be immediately and irreparably harmed if they are not immediately granted the authority to use cash collateral (the "Cash Collateral") of Mayrich[2] and to obtain post-petition financing from the DIP Lender in accordance with the terms of the DIP Credit Agreement. The relief sought herein is necessary in order to permit, among other things, the orderly continuation of their business, the ability to fund payroll and payroll taxes, the maintenance of its relationship with its vendors and suppliers, satisfaction of its workers capital needs, as well as the ability to pay taxes, inventory, supplies, overhead, rent, insurance and other necessary expenses. The access of the Debtors to sufficient working capital and liquidity made available through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtors and to a successful reorganization of the Debtors.

---

[2] Mayrich has consented to the Debtors use of cash collateral during these Chapter 11 Cases consistent with the terms set forth herein.

27.     Absent use of Cash Collateral and the additional funds provided by the DIP Financing, the Debtors project they will run out of cash to operate within days. The Debtors require the continued use of Cash Collateral to fund their operations with any shortfall in funds provided for by the DIP Financing. It is critical that the Debtors have sufficient funding to meet their ordinary course and bankruptcy-related obligations in order to effectuate an orderly reorganization. The Debtors believe that the DIP Financing, together with the continued use of Cash Collateral, will enable them to meet all of their obligations in these Chapter 11 Cases.

28.     Given the Debtors' financial condition, the Debtors were unable to obtain adequate unsecured credit allowed under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors' are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting the DIP Lender, subject to the Carve-out (defined below), the DIP Liens (defined below) and the DIP Superpriority Claims (defined below) under the terms and conditions set forth in the DIP Credit Agreement.

29.     After good faith arm's-length negotiations with respect to the terms and conditions of the DIP Financing, and after soliciting proposals from other potential DIP lender's, the Debtors concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Credit Agreement and the Interim DIP Order clearly represents the most favorable terms and adequate source of financing presently available to the Debtors.

30.     Despite the Debtors' efforts, no lender was willing to offer the Debtors any financing, particularly without priming any of the prepetition liens.

31.     The DIP Financing, which is proposed by an entity owed by certain members of

11

BKD, is far superior to any financing available to the Debtors, and is in the best interest of the Debtors, their creditors and other stakeholders. As outlined in more detail below, the DIP Financing (a) provides for up to $1 million of financing, of which $100,000, is required on an interim basis, (b) has a stated maturity date of the confirmation of these Chapter 11 Cases, (c) is junior to the existing pre-petition Pac West and Mayrich credit facilities, (d) does not contain any case-controlled deadlines, (e) provides for adequate protection payments to Pac West and (f) contains very reasonable covenants and conditions.

32.    Thus, the Debtors submit that the terms of the proposed use of cash collateral and DIP Financing are fair, reasonable and balanced, reflect the Debtors' exercise of sound business judgment consistent with their fiduciary duties, are the best available under the circumstances, supported by reasonably equivalent value and fair consideration, and should be approved on an interim and final basis.

**Summary of DIP Financing Terms**

33.    In accordance with the disclosure requirements of Bankruptcy Rule 4001(b)(1)(B) and Local Rule 4001-2. [3]

| | |
|---|---|
| *Borrowers* | RM Bakery, LLC and BKD Group LLC (collectively, the "Debtors" or "Borrowers" |
| *Lender* | FS Lenders 2015 LLC. (the "DIP Lender") |

---

[3] The descriptions of the material terms of the proposed DIP Financing and Interim DIP Order provided in this Motion are intended only as a summary thereof. In the event of any inconsistency between the description set forth herein and the terms of the DIP Credit Agreement and/or Interim DIP Order, the terms of the DIP Credit Agreement and the Interim DIP Order shall govern. All capitalized terms used but not otherwise defined in this summary chart shall have the meaning ascribed to them in the DIP Credit Agreement. Sections that must be highlighted for the Court under either Bankruptcy Rule 4001(b)(1)(B) or Local Rule 4001-2 are in bold in reference to the DIP Credit Agreement and the Interim DIP Order are provided.

| | |
|---|---|
| *Commitment, Availability and Purpose* | The DIP Financing shall be a secured revolving credit facility of up to $1,000,000 for which the DIP Lender receive protection under Section 364(c) and 364(d) of the Bankruptcy Code. $100,000 of the DIP Loan will be delivered to the Debtors, to be used by the Debtors solely in accordance with the Interim DIP order, DIP Budget uses of the proceeds as set forth in Section 2(b) and the other provisions of the of the DIP Credit Agreement ("<u>Initial Draw</u>"). On or after the Final Order Entry Date, or the Business Day immediately succeeding such day, the Debtors may draw on one or more occasions, additional amounts under the DIP Loan to be used solely in accordance with the Financing Orders, DIP Budget, the uses of the proceeds as set forth in Section 2(b) and the other provisions of the of the DIP Credit Agreement. Each Draw under the Additional Draw must be on no less than one Business Day notice by the Debtors to the DIP Lender. The aggregate principal amount that may be drawn pursuant to the of the DIP Credit Agreement, (i.e., the sum of the Initial Draw and the Additional Draws) is a Maximum Commitment.<br><br>The DIP Loan and proceeds thereof will be used by the Debtors solely for the purposes as set forth in the Agreement and the DIP Budget.   DIP Credit Agreement § 2(b), Interim DIP Order ¶ 13. |
| *Term and Maturity* | The maturity date (the "Maturity Date") of the DIP Financing is as follows: the earliest of (i) the date which plan of reorganization for either of the Debtors from the Bankruptcy Becomes effective, (ii) the day on which the DIP Obligations become immediately due and payable pursuant to the terms of the DIP Credit Agreement,, or by Court order or (iii) the date that substantially all of the assets of RM Bakery are sold, transferred or alienated in any way. DIP Agreement § 1(hh). |
| *Interest Rate, Payments, Fees and Expenses* | **Interest Rate**: 10%per annum (the "Applicable Rate"). |

| | |
|---|---|
| | **Default Rate:** In the event of a default by the Debtors as specified in the DIP Credit Agreement, the interest rate charged will be the Applicable Rate plus 300 basis points.<br><br>**Interest Calculation:** Interest payable pursuant to the DIP Credit Agreement will be computed on the basis of a 360-day year for the actual number of days elapsed. In computing interest of the outstanding principal balance of the DIP Facility, the date of making an advance under the DIP Facility will be included, and the date of any repayment of the DIP Facility will be excluded.<br><br>**Cash Interest:** Accrued and unpaid interest on the DIP Facility will be payable in arrears on (i) the first day of each calendar month, and if such day is not a Business Day immediately preceding Business Day; or (2) the Maturity Date.<br><br>**Fees:** A commitment of 2% of the Maximum Commitment. DIP Credit Agreement, Sections 1(d), 1(l), 2(d), 2(e) and 8(a)(xi). |
| *Conditions Precedent to Closing and Funding* | The obligation of the DIP Lender to make the DIP Loan and the other financial accommodations as set forth in the DIP Credit Agreement on the Closing Date, or any other date on which the Debtors request an advance of the DIP Loan, is subject to the satisfaction, or waiver of the following conditions (such satisfaction or waiver demonstrated by the funding of a DIP Loan)"<br><br>**Interim and Final DIP Orders.** The Interim DIP Order and the Final DIP Order, all provisions thereof and the priorities and DIP Liens granted under Bankruptcy Code section 364(c) and (d), as applicable, will be in form and substance satisfactory to the DIP Lender and Mayrich, and the Final DIP Order will be entered no later than July 15, 2020 , in a form and substance acceptable to the DIP Lender and Mayrich, in their sole discretion and will include, among other things the following provisions: (1) modifying the automatic stay to permit the creation and perfection of the DIP Liens; (2) granting |

14

Mayrich Replacement Lien and such other Adequate Protection that the Debtors and the DIP Lender may permit; (3) granting Cap West Adequate Protection Liens and such other Adequate Protection that the Debtors and the DIP Lender may permit; (4) granting the Liens provided for in the DIP Credit Agreement; (5) prohibiting any granting or imposing of Liens other than the DIP Liens and any other that the DIP Lender and Mayrich may permit in their sole discretion; (6) authorizing and approving the Debtors to sign and deliver the DIP Credit Documents to which each will be a party and the transaction contemplated therein, including the granting of the Superpriority status, the first-priority, and the DIP Liens upon the DIP Collateral, and the payment of all fees and expenses due to the DIP Lender.

As of the Final Order Entry Date, the DIP Final Order will further state, among other things, that, upon entry of the DIP Final Order: (1) the DIP Lender and its counsel, advisors, and consultants, will each be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code; and (2) Mayrich and its counsel, advisors, and consultants, will each be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code; and (3) permit the DIP Lender and Mayrich the right to credit bid, subject to section 363(k) of the Bankruptcy Code or applicable law, the DIP Loan in whole or in part, in connection with any plan, sale, or other disposition of assets in the Cases.

**Compliance with Financing Orders.** No Financing Order will have been reversed, modified, amended, stayed, or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the prior written consent of the DIP Lender and Mayrich. The Debtors will be in compliance in all respects with the Financing Orders.

**Debtor-in-Possession**.  No trustee or examiner will have been appointed with respect to the Debtors or their assets.

15

**DIP Budget**. The DIP Lender will have received: (1) the DIP Budget; (2) all information then required to be delivered to the DIP Lender pursuant to Section 10(c) of the DIP Credit Agreement; and (3) such other information (financial or otherwise) as may be reasonably requested by the DIP Lender.

**Performance of Obligations.** All costs, fees, expenses and other compensation payable to the DIP Lender will have been paid to the extent due and payable in accordance with the terms of any Financing Order, the DIP Credit Agreement, and the other DIP Credit Documents, and the Debtors will have complied in all material respects with all of their other obligations to the DIP Lender as set forth in the DIP Credit Agreement and other DIP Credit Documents.

**Insurance/Assets**. The DIP Lender will be named as a loss payee (in respect of property/casualty insurance policies maintained by the Debtors), and that the DIP Lender will be provided with 30 days' advance notice of nonrenewal, cancellation, or amendment riders in respect of such policies.

**No Default**. No Event of Default will exist at the time of, or after giving effect to, the transactions contemplated on the Closing Date, including the advancing of the DIP Loan.

**Representations and Warranties**. All representations and warranties in the DIP Credit Documents will be true and correct in all material respects as of the Closing Date.

**DIP Credit Documents**. The DIP Lender and Mayrich will have received the signed original copies of each DIP Credit Document.

**Other Information**. The DIP Lender will have received any other financial or non-financial information regarding both Debtors as the DIP Lender may reasonably request.

16

| | |
|---|---|
| | **Certain Expenses**.  The Interim DIP Order and the DIP Budget will provide for the Debtors to pay, on the terms and schedule provided therein, all fees and reasonable out-of-pocket expenses of the DIP Lender incurred in connection with the DIP Credit Agreement and the other DIP Credit Documents, including the reasonable fees (including the Commitment Fee), costs and expenses of its counsel (the "Formation Expenses"); the DIP Lender will submit the Formation Expenses, on one or more occasions, to the Debtors. The Debtor's will promptly pay such expenses, but in no event, such payment will be made by the Debtors to the DIP Lender on or before seven (7) Business Days after such expenses are submitted to the Debtors by the DIP Lender. If the Debtors fail to pay the Formation Expenses when due, the amount of the Formation Expenses will be added to the principal outstanding under the DIP Loan as of the due date and will not be deemed an Event of Default.<br><br>**No Material Adverse Change**.  Both Debtors will have continued to operate their business in the ordinary course through the Closing Date and, since the Petition Date, there will have been no material adverse effect.<br><br>DIP Credit Agreement §§ 8 and 10(b)(iii). |
| *Collateral and Lien Priority* | **DIP Liens**. As security for the DIP Obligations, effective and perfected upon the Interim Order Entry Date and without necessity of the execution, recordation, of filing by the DIP Lenders of mortgages, security agreements, control agreements, pledge agreements, financing statements, or similar documents, or the possession or control by the DIP Lender, shall be granted valid, binding, enforceable non-avoidable and automatically perfected security interest in liens on all of the DIP Collateral (as defined below) pursuant to an Interim DIP Order, the DIP Final Order and the other DIP Credit Documents (collectively, the "DIP Liens"). Both of the Debtors grant and convey to the DIP Lender, subject to the entry of the Financing Orders, the following liens and protections to secure the DIP Obligations, |

17

subject to the Carve-out (as defined below):

a.   **Senior DIP Lien**.  Pursuant to section 364(c)(2) of the Bankruptcy Code (and subject to (i) the Carve-Out, (ii) the valid and perfected security liens or security interest existing on the Petition Date (which are currently held by Pac West and Mayrich), (iii) the Replacement Liens and (iv) the Adequate Protection Liens), the DIP Lender is hereby granted and will be secured by a valid, binding, continuing, enforceable and fully perfected first priority security interest and Lien on all pre- and post-petition property of the Debtors and/or interest of the Debtors in property whether existing on the Petition Date or hereafter acquired, that, on or as of the Petition Date or the date acquired (if after the Petition Date) is not subject to valid, perfected and non-avoidable Liens, including, all cash and cash collateral of the Debtors (whether maintained with the DIP Lender or otherwise) and investment of such cash and cash collateral, all inventory, all Accounts, other rights to payment whether arising before or after the Petition Date, all chose in action, all avoidance power actions the Debtors have, or will have, under section 544 through 551, in section 553, of the Bankruptcy Code, books and records, investments, all real estate, all contracts, all properties, Equipment, general intangibles, documents, instruments, all vehicles, or Deposit Accounts all goods, work in progress, all fixtures, all finished goods, or chattel paper, investment property, in all leaseholds, or real properties), all patents, or copyrights, trademarks, or tradenames, other Intellectual Property, capital stock of subsidiaries, other capital stock, and the proceeds rents, profits, accessions, substitutions, insurance proceeds, warranty and indemnity proceeds, and all other product, offspring, or profits of all of the foregoing (collectively, the "Secured Assets").

b.   **Junior DIP Lien**. Pursuant to section 364 (c)(3) and (d)(1) of the Bankruptcy Code, the DIP Obligations owed to the DIP Lender will be secured by a valid, binding, continuing, enforceable, and fully protected security interest and Lien in all the Secured Assets, junior in priority only to (i) the "Carve-out" (to be ordered in the DIP Interim Order and the DIP Final

|  | Order), (ii) the valid and perfected security liens or security interest existing on the Petition Date (which are currently held by Pac West and Mayrich), (iii) the Replacement Liens and (iv) the Adequate Protection Liens. |
|  | **Adequate Protection Liens**. |
|  | **a.  Mayrich**.  The Debtors are authorized to use the Cash Collateral of Mayrich, pursuant to and in accordance with the terms of the Interim DIP Order and the Budget. As adequate protection for the Debtors' Use of Cash Collateral of Mayrich, Mayrich is granted a replacement security interest and lien (the "Replacement Liens" on their Pre-petition Collateral, but solely to the extent of any divination in the value of such Prepetition Collateral. Additionally, the Debtors will provide interest to Mayrich on the terms of its pre-petition loan at the non-default, contract interest rate. The Debtors, at their option, will either (i) pay this interest to Mayrich during the pendency of the Cases, or (ii) this interest will accrue during the pendency of the Chapter 11 Cases. For the avoidance of doubt, the Debtor's failure to pay Mayrich such interest during the pendency of the Chapter 11 Cases, will not be an Event of Default. |
|  | **b.    Pac West.**   As adequate protection for the Debtors' use of the Equipment for which Pac West has a security interest, Pac West is granted a replacement security interest in the Equipment in the same priority as it had prepetition  (the "Adequate Protection Liens"). In addition, the Debtors will pay Pac West 4% per annum, of the maximum value of the Equipment, which at most is worth $448,500, which the Debtors will pay on a monthly basis. |
|  | DIP Credit Agreement §§ 1(c), 1(rr) and 5(a). |
| *Superpriority   Administrative Expense Claims* | **DIP Superpriority Claims**.   In accordance with sections 364(c)(1) and 507(b) of the Bankruptcy Code, and subject to (i) the "Carve-out" (to be ordered in the DIP Interim Order and the DIP Final Order), (ii) the valid and perfected security liens or security interest |

| | |
|---|---|
| | existing on the Petition Date (which are currently held by Pac West and Mayrich), (iii) the Replacement Liens and (iv) the Adequate Protection Liens, all DIP Obligations under the DIP Facility shall constitute claims (the "DIP Superpriority Claims") with priority in payment over any and all administrative expense of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, section 105, 326, 328, 330, 331, 503(b), 506(c), 1113 and 1114 of the Bankruptcy Code and shall at all times be senior to the rights of the Debtors, any successor trustee to the extent permitted by law, or any other creditor in the Chapter 11 Cases.<br><br>Interim DIP Order ¶ 25.<br><br>**Waiver**. No cost or expense of administration under sections 105, 364(c)(1), 503(b), 507(b), 726 (to the extent permitted by law), 1113, 1114 or otherwise of the Bankruptcy Code shall be senior to, equal to or *pari passu* with, the Superpriority Claims of the DIP Lender arising out of the DIP Obligations, or thereafter, the Replacement Liens and/or the Adequate Protection Liens. Interim DIP Order ¶ 24. |
| *Reporting Requirements* | Unless such requirements are waived by the DIP Lender, the Debtors will furnish to the DIP Lender and Mayrich:<br><br>(i) Within one week from the last day of each Budget Period, a report setting forth, in a form in sufficient detail satisfactory to the DIP Lender, a comparison of actual receipts and expenses to budgeted receipts and expenses for said Budget Period, indicating any Permitted Variances.<br><br>(ii) A copy of each Monthly Operating Report on the day it is filed.<br><br>(iii) Within five (5) Business Days after either Debtor obtains knowledge thereof, a written statement of the Debtors setting forth details of: |

| | |
|---|---|
| | (1) any litigation or governmental proceeding filed or threatened in writing against either or both Debtors other than any claim or litigation filed in the Bankruptcy Court; and |
| | (2) any other event, act or condition that has or could reasonably be expected to have a material adverse effect on the overall business of the Debtors or their prospects for reorganization. |
| | (iv) As promptly as reasonably practicable on one or more occasions following the DIP Lender's request therefor, such other information regarding the operations, business affairs and financial conditions of the Debtors as the DIP Lender may reasonably request. |
| | Interim DIP Order ¶ 23.  DIP Credit Agreement § 10(b). |
| *Events of Default* | **DIP Collateral Documents and other DIP Credit Documents**.  At any time after the signing and delivery thereof, of the DIP Credit Agreement or any DIP Credit Documents cease to be in full force and effect (other than by reason of release of DIP Collateral in accordance with the terms of this Agreement or thereof or satisfaction in full of the DIP Obligations in accordance with the terms of this Agreement) or will be declared null and void, or the DIP Lender will not have or will cease to have a valid and perfected DIP Lien in any material portion of the DIP collateral. <br><br> **Other Events of Default.** (i) Either Debtor files a plan of reorganization or liquidation, or enters into any transaction for the sale of all or substantially all of either or both of the Debtors' assets that does not provide for payment in full in cash of the DIP Obligations, unless approved in writing by the DIP Lender; (ii) a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of either Debtor (powers beyond those set forth in Sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), is appointed in these Cases;  (iii)  any other Lien is granted with respect to |

| | |
|---|---|
| | any of the DIP Collateral without the prior written consent of the DIP Lender unless at the time such Lien is granted all DIP Obligations are indefeasibly paid in full in cash; (iv) the Bankruptcy Court enters an order granting relief from the automatic stay to any creditor or party in interest:  (1) to permit the enforcement of any Lien on any material asset of either Debtor; or (2) to permit other actions that the DIP Lender may, in its reasonable discretion, deem to have a material adverse effect on the business of the Debtors;  (v) any material provision of the DIP Credit Documents ceases to be valid or binding on either Debtor, or either Debtor so assert, in any pleading filed in any court; (vi) any Order is entered reversing, amending, supplementing, staying, vacating, or otherwise modifying in any material respect a DIP Interim Order or the DIP Final Order without the prior written consent of the DIP Lender; (vii) the exclusive period for either or both Debtors to file a plan of reorganization under Section 1121(b) of the Bankruptcy Code expires or is terminated; (viii) the DIP Final Order is not entered by the Bankruptcy Court by July 15, 2020;  (ix) the Secured Claim of Pac West is allowed by final order in an amount exceeding $448,500; either Case is dismissed or converted to a chapter 7 proceeding; (xi) either or both Debtors file a liquidating plan; and (xii) any subsidiary or either or both Debtors is sold or liquidated without the prior written approval of the DIP Lender.<br><br>Interim DIP Order ¶ 27.  DIP Credit Agreement § 12(d). |
| *506(c) Waiver* | Neither the Debtors or any other person shall assert a claim under section 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender or Mayrich, the Prepetition Collateral or the collateral subject to the Replacement Liens or for any expense of the administration of the estate.<br><br>DIP Credit Agreement § 5(b). |
| | |

| | |
|---|---|
| *Carve-out* | Notwithstanding anything to the contrary contained anywhere in the Interim Order and/or the DIP Credit Agreement, the Prepetition Collateral and all collateral which is made subject to the security interest and liens granted to the DIP Lender, and Mayrich, pursuant to the terms of the Interim Order, shall be subject to a carve-out (the "Carve-out") for the sum of allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6) and Priority Professional Expenses. "Priority Professional Expenses" means allowed fees, costs, and reasonable expenses allowed or permitted pursuant to sections 330 and 331 of the Bankruptcy Code of (a) professionals retained by the Debtors and (b) any professionals retained by any Committee that may be appointed in these Chapter 11 Cases, up to the amount of $100,000, for both Debtors' and the Committee's professionals, but subject to the amount set forth in the Budget provided. Interim DIP Order ¶ 26.  DIP Credit Agreement §§ 1(g) and 3(b). |
| *Credit Bidding* | Following entry of the Final DIP Order, the DIP Lender and Mayrich will have the right to credit bid, subject to section 363(k) of the Bankruptcy Code or applicable law, the DIP Loan, in whole or in part, in connection with any plan, sale, or other disposition of assets in these Cases.  DIP Credit Agreement § 8(a)(ii) |
| *Relief from Automatic Stay* | **Modification of Automatic Stay**. The automatic stay provisions of section 362 of the Bankruptcy Code or modified and lifted to the extent necessary to implement the provisions of the Interim DIP Order and the DIP Credit Agreement to permit the creation and perfection of the DIP Liens. DIP Credit Agreement § 8(a)(i)(1).  Interim DIP Order ¶¶ 18 and 21<br><br>**Termination of the Automatic Stay**.  Upon the occurrence of an Event of Default and following the giving of five (5) Business Days' notice to counsel for the Debtors, counsel for any Committee appointed in these Chapter 11 Cases, and the United States Trustee,, the DIP Lender shall have immediate relief from the automatic stay and foreclose on all or any portion of the DIP Collateral, or otherwise exercise remedies against the DIP Collateral, as permitted by |

| | |
|---|---|
| | applicable non-bankruptcy law and the Debtors' right to use Cash collateral shall cease. During such five-business-days'- notice-period, the Debtors in any appointed Committee shall be entitled to an emergency hearing with this Court for the sole purpose of contesting whether an Event of Default has occurred. Interim DIP Order ¶ 27. |
| *Valid Liens* | **DIP Liens.** The DIP Liens granted to the DIP Lender pursuant to the Interim DIP Order and the DIP Facility or deemed valid and perfected upon the entry of the Interim DIP Order without the necessity of the DIP Lender taking possession of, filing financing statements, mortgages or other documents. Upon the request of the DIP Lender, the Debtors shall execute and deliver to the DIP Lender any and all UCC financing statements, mortgages, notes, assignments, or other instrument or document considered by the DIP Lender necessary in order to perfect the DIP Liens; and the DIP Lender is hereby granted relief from the Automatic Stay embodied in section 362(a) of the Bankruptcy Code to receive, file and record the foregoing. DIP Credit Agreement §3; Interim DIP Order ¶ ¶ 15 and 18.<br><br>**Adequate Protection Liens**.    The Adequate Protection Liens and security interest granted to Pac West; and the Replacement Liens and security interest granted to Mayrich, pursuant to the interim DIP Order or deemed valid and perfected upon entry of the interim DIP Order without the necessity of Pac West or Mayrich taking possession of the, filing financing statements, mortgages or other documents. Upon the request of Cap west or Mayrich, the Debtor's shall execute and deliver to the Pac West and/or Mayrich in order to perfect the Adequate Protection Liens and Replacement Liens; and Pac West and Mayrich are hereby granted relief from the automatic stay embodied in section 362(a) of the Bankruptcy Code to receive, file, and record the foregoing. Interim DIP Order ¶ ¶ 20 & 21. |
| *Avoidance Actions* | The DIP Collateral includes Avoidance Power Actions. DIP Credit Agreement §3(a). Interim DIP Order ¶ 15. |

## RELIEF REQUESTED

34.     By this Motion, the Debtors seek entry of the DIP Orders granting the following relief: (i) authorizing the Debtors' use of Cash Collateral of Mayrich pursuant to section 363 of the Bankruptcy Code; (ii) granting the Adequate Protection Liens to Pac West and the Replacement Liens to Mayrich pursuant to sections 361 and 363 of the Bankruptcy Code; (iii) authorizing and approving the Debtors' entry into the DIP Credit Agreement and performance of such other acts as may be necessary or appropriate in connection therewith, to obtain up to $1,000,000 of secured post-petition loans and advances pursuant to the DIP Orders, of which $100,000 will be available upon entry of the Interim DIP Order; (iv) granting to the DIP Lender the DIP Liens (subject to the Carve-out) in and upon the DIP Collateral pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code; (v) granting an allowed DIP Superpriority Claims to the DIP Lender pursuant to section 364(c)(1) of the Bankruptcy Code; (vi) vacating and modifying the automatic stay to the extent necessary to effectuate the terms and provisions of the DIP Credit Agreement and the DIP Orders; and (vii) scheduling the Final Hearing to consider entry of the Final DIP Order.

## BASIS FOR RELIEF

35.     The Debtors do not have sufficient unencumbered cash or other assets to continue to operate their business during these Chapter 11 Cases or to effectuate a reorganization. The Debtors will be immediately and irreparably harmed if they are not immediately granted the authority to use Cash Collateral of Mayrich and to obtain post-petition financing from the DIP Lender in accordance with the terms of the DIP Credit Agreement and order to permit, among other things, the orderly continuation of its business, the ability to fund payroll and payroll taxes, the maintenance and relations with its vendors and suppliers, satisfaction of its working capital

needs, as well as the ability to pay taxes, inventory, supplies, overhead, insurance and other necessary expenses. The access of the Debtors to sufficient working capital and liquidity made available through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtors into a successful reorganization of the Debtors.

**A.    The DIP Loan is Warranted and Should be Approved.**

36.    Despite reasonable efforts, the Debtors have been unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Credit Agreement and are unable to obtain adequate unsecured credit allowable under 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting the DIP Lender, subject to the Carve-out (defined below), the DIP liens and the DIP Superpriority Claim under the terms and conditions set forth in the Interim Order and the DIP Credit Agreement. Significantly Mayrich, consents to granting the DIP Lender and the DIP Liens pursuant to 364(d)(1) of the Bankruptcy Code.

37.    In the absence of sufficient funds to support the Debtors' ongoing operations, the value of the Debtor's assets and operations will dissipate, jeopardizing their ability to maximize value to the detriment of the Debtors estates, creditors and all parties in interest. Without the proposed financing and use of cash collateral, the Debtors would likely be forced to shut down their operations and liquidate their assets. Thus, authorizing and approving the Debtors' entry into the DIP Credit Agreement and authorization to use Cash collateral will maximize value for the Debtors' estate. Accordingly, the timely approval of the relief requested herein is imperative.

38.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a

debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incurred debt (a) with priority over any and all administrative expenses specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C §364. The Debtors propose to provide, among other things, superpriority claims, security interest, and liens pursuant to sections 364(c)(1), (2), (3) and (d) of the Bankruptcy Code.

39.    The Debtors' goal of a successful reorganization under a chapter 11 plan can be achieved only if the Debtors are immediately authorized to use Cash Collateral and to enter into the DIP Financing pursuant to the DIP Credit Agreement and to use proceeds to operate their business. The debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b).

40.    The Debtors negotiated the DIP Credit Agreement at arms' length. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance there with. S*ee, e.g., Bray Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)* 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores. Inc*., 11 B.R.34 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Curlew Valley Assocs*.,

14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co*., 47 B.R. 444, 449 (D. Colo. 1985).

41.     Furthermore, section 364(d) does not require the debtors seek alternative financing from every possible source. Rather, the debtor simply must demonstrate sufficient effort to obtain financing without the need to grant senior liens. *In re Snowshoe Co*., 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions and geographic area); *In re 495 Central Park Ave. Corp*., 136 B.R. 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position").

42.     The terms and conditions of the DIP Facility, including the DIP Collateral Documents, are fair and reasonable and were negotiated in good faith at arms' length. Accordingly, the obligations incurred in connection with the DIP Loan should be accorded the benefits of section 364(e) of the Bankruptcy Code.


**B.      The Debtors' Use of Cash Collateral is Warranted and Should be Approved.**

43.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use Cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. 363(c)(2).  Thus, pursuant to section 363(c) of the Bankruptcy Code, the debtor may not use Cash collateral without the consent of any entity with an interest in such collateral or Court approval. With respect to Mayrich, the Debtors respectfully submit that the Court should order the relief requested herein under section

28

363(c)(2)(B) of the Bankruptcy Code given the adequate protection being provided to Mayrich under section 361 and 363(e) of the Bankruptcy code as set forth herein. As noted above, Mayrich has consented to the use of Cash Collateral in exchange for the Replacement Liens provided by the Debtors.

44.     Section 363(e) of the Bankruptcy Code provides in pertinent part that, "on request of an entity that has an interest in property used… Or proposes to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Examples of adequate protection are provided in section 361 of the bankruptcy code and include, but are not limited to: (a) lump sum or periodic cash payments to the extent that such use will result in a decrease in value of such entities interest in the property; (b) provisions for an additional or replacement lien to the extent that the use of the property will cause a decrease in the value of such entities interest in the property; and (c) such other relief as will result in the realization by the entity of the indubitable equivalent of such entities interest in the property. 11 U.S.C. § 361.

45.     By adequate protection, the Bankruptcy Code seeks to shield the secured creditor from the diminution in value of its interest in the particular collateral during the period of use. *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

46.     While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See In re Columbia Gas*

*Sys., Inc.,* Nos. 91-804, 1992 WL 79323, at \*2 (Bankr. D. Del. Feb. 18, 1992); *In re Swedeland*

*Dcv. Grp., Inc.,* 16 F.3d 552, 564 (3d Cir. 1994); *In re N.F. Affordable Homes Corp.,* No. 05-

60442, 2006 WL 2128624, at \*14 (Bankr. D.N.J. June 29, 2006); *see also In re Mosello,* 195

BR. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Dynaco Corp.,* 162 B.R. 389, 394 (Bankr. D.N.H.

1993) (citing 2 Collier on Bankruptcy § 361.01[1] at 361-66 (15th ed. 1993)) (explaining that

what constitutes adequate protection is not defined, and "must be determine based upon

equitable considerations rising from the particular facts of each proceeding").

47.    For example, courts have held that replacement liens are sufficient adequate

protection. *See In re Mt. Olive Hospitality, LLC*, Civil No. 13-3395 (RBK), 2014 WL 1309953,

at \*3, n. 6 (D.N.J. March 31, 2014).  *See also In re Airport Inn Assocs., Ltd.*, 132 B.R. 951, 960

(Bankr. D. Col. 1990) ("The court could order a lien in post-petition accounts receivable as

adequate protection if that relief was requested…."); *In re Int'l Design & Display Grp., Inc.*,

154 B.R. 352, 364 (Bankr. S.D. Fla. 1993) (court authorized debtor to use cash collateral and,

as adequate protection, granted secured creditor replacement lien on all post-petition accounts

receivable, inventory and contracts to the extent the creditor's collateral was depleted).

48.    The Interim DIP Order provides adequate protection for the Debtors' use of Cash

Collateral of Pac West and Mayrich, in the form of a replacement security interest and lien (the

"Adequate Protection Liens" in the case of Pac West, and the "Replacement Liens" in the case

of Mayrich.

49.    Additionally, in accordance with sections 364(c)(1) and 507(b) of the

Bankruptcy Code, the Interim Order provides that Pac West and Mayrich are granted a claim

with priority and payment over any and all administrative expenses of the kind specified or

ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections

105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 1113 and 1114 of the Bankruptcy Code and shall at all times be senior to the rights of the Debtors, and any successor or trustee to the extent permitted by law, or any other creditor in the Chapter 11 Cases (the "Adequate Protection Superpriority Claims").

50.    In addition, the Debtors propose to continue to make monthly interest payments to Pac West at the contract rate set forth in the prepetition loan documents.[4] moreover the use of cash collateral in the infusion of up to $1,000,000 of new money that is junior in priority to Pac West provides additional adequate protection for Pac West's interest in the Debtors' Equipment because the use of those funds will ensure that the collateral securing Pac West's debt will be maintained and preserved.

51.    In sum, the adequate protection offered by Debtors to the prepetition secured lenders is fair, reasonable and sufficient to protect against diminution of their collateral position. Accordingly, the Debtors respectfully submit that the use of Cash Collateral on the terms set forth in the proposed interim DIP Order provides Pac West and Mayrich with adequate protection and is in the best interest of the Debtors, the Debtors' estates, their creditors and all parties in interest, and, therefore should be authorized by this Court.

**C. The Section 506(c) Waiver Should be Approved.**

52.    The Debtors seek approval of their waiver of any right to surcharge the Collateral pursuant section 506(c) of the Bankruptcy Code. Congress' intent in enacting section 506(c) of the Bankruptcy Code was to assure that when a claimant "expands money to provide for the

---

[4] The Debtors propose to pay Pac West at the prepetition contract rate only at the value of Pac West's prepetition collateral which was appraised in January 2019 to have a value of $448,500.  This was prior to the current coronavirus pandemic, which the debtors submit has reduced the value of Pac West's prepetition collateral significantly since the appraisal.

reasonable and necessary costs and expenses of preserving or disposing of a secured creditors

collateral, the … debtor-in-possession is entitled to recover such expenses from the secured

party or from the property securing an allowed secured claim by such party." *In re Visual*

*Indus. Inc.*, 57 F.3d 321, 325, (3d Cir 1995) (quoting 124 Cong. Rec. 3232, 398 (cum. ed. Sept.

28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S. Cong. & Admin. News 6451).

However, waivers of a debtor's right to surcharge a secured creditor's collateral are commonly

found in DIP financing arrangements between sophisticated parties. As one court has noted,

"the Trustee and Debtors-in-Possession in this case had significant interest in asserting claims

under § 506(c) and have made use of their rights against the Lender under § 506(c) by waving

them in exchange for concessions to the estates (including a substantial care-out for the benefit

of administrative creditors)." *In re Molten Metal Tech. Inc*., 244 B.R. 515, 527 (Bankr. D. Mass.

2000), vacated and remanded on other grounds, 2001 WL 36381917 (1st Cir. BAP March 11,

2000). *See also In re Nutri/System of Florida Assocs*., 178 B.R. 645, 650 (E.D. Pa 1985) (noting

that the debtor had waived section 506(c) rights in obtaining debtor-in-possession financing).

53.    The waiver of surcharge rights under section 506(c) is particularly appropriate

where, as here, it is consented to in exchange for benefits received from both postpetition

financing and a Carve-out. The Debtors have agreed to waive the uncertainty of their surcharge

rights in exchange for immediate and necessary liquidity from the DIP Lender and the valuable

and predictable rights granted to the Debtors' estate professionals under the Carve-out. *See In

re Lunan Family Rests. Ltd., P'ship*., 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof

is on any Proponent of § 506(c) treatment, who must show by a preponderance of evidence that

[(1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured

creditor was the party primarily benefited by the expenditure]"). Accordingly, the Debtors

submit that the section 506(c) waiver is appropriate under the circumstances and should be approved.

**D.    Modification of the Automatic Stay is Warranted.**

54.    The DIP Credit Agreement provides certain circumstances under which the automatic stay of section 362 of the Bankruptcy Code may be modified. Specifically, the DIP Credit Agreement provides that upon the occurrence of in Event of Default (as defined in the DIP Credit Agreement), but subject to five (5) business days prior written notice to the Debtors with respect to in Event of Default (as defined in the DIP Credit Agreement) close, with a copy of such notice provided to counsel for the Debtors, counsel for any Official Committee of Unsecured Creditors, and the United States Trustee, the automatic stay shall terminate automatically to allow the DIP Lender to enforce its rights against the DIP Collateral and to exercise any other default-related rights and remedies under the DIP Credit Agreement or applicable law.

55.    The Debtors submit that such modification of the automatic stay are customary in market in DIP financing similar to the DIP Financing proposed herein. Accordingly, the Debtors submit that the Court should modify the automatic stay to the extent contemplated by the DIP Credit Agreement and the proposed Interim DIP Order.

**E.    Interim Approval of the DIP Financing Should Be Granted.**

56.    Bankruptcy Rules 4001(b)(2) and (c)(2) provide that a final hearing on a motion for authorization to use Cash Collateral or a motion to obtain credit may not be commenced earlier than 14 days after service of such motion. The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such 14-day period and to authorize the use of cash collateral or the obtaining of credit where, as here, such relief is necessary to avoid

immediate and irreparable harm to a debtor's estate, pending a final hearing.

57.     The failure to obtain interim approval of the use of Cash Collateral and DIP Financing on an expedited basis is likely to lead to immediate and irreparable harm to Debtors' estates because the Debtors have an immediate need for cash, and need to quickly instill confidence in their employees, their trade vendors, and service providers, that the Debtors will have access to sufficient working capital and liquidity for their operations during these Chapter 11 Cases. That Confidence will help to preserve and maintain the going-concern value of the Debtors. Accordingly, the Debtors seek immediate entry of the Interim DIP Order to prevent immediate and irreparable harm to the Debtors' estates pending the Final Hearing pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).

**F.     Request for a Final Hearing.**

58.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing as soon as practicable, and fix in the Interim DIP Order a date and time prior to the Final Hearing for parties to file objections to approval of the Motion on a final basis and entry of a Final DIP Order.

**NOTICE**

51.     Notice of this motion has been given to (i) the Office Of The United States Trustee for the Southern District of New York Office of the United States Trustee, United States Trustee's Office Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, Ny 10014; (ii) counsel to the Debtors' secured lender, Pacific Western Bank; Porzio, Bromberg & Newman P.C., Michael L. Rich, 156 West 56th Street, Suite 803, New York, NY 10019; (iii) counsel to the Debtors' secured lender Mayrich Capital LLC; Becker, Glynn, Muffly, Chassin & Hosinski LLP, Alec P. Ostrow, 299 Park Avenue, New York, NY 10171;

(iv) the debtors' proposed DIP Lender, FS Lenders 2015 LLC, 220 E. 42nd St., 29th Floor, New York, NY 10016; (v) Internal Revenue Service, Centralized Insolvency Operations, P.O. Box 7346, Philadelphia, PA 19101-7346; (vi) The United States Attorney for the Southern District Of New York, United States Attorney's Office, 86 Chambers Street, 3rd Floor, New York, NY 10007; (vii) all equipment lenders who filed a UCC; (viii) all parties entitled to notice under Local Bankruptcy Rule 9013-1(b); and (viii) the debtors' twenty largest unsecured creditors on a consolidated basis. In light of the nature of the relief requested herein, the debtors respectfully submit that no other or further notice is required.

*(Remainder of this page intentionally left blank.)*

**WHEREFORE,** the Debtors respectfully request entry of the Interim DIP Order, substantially in the form submitted here with, (a) authorizing the Debtors to continue to use Cash collateral on the terms proposed and obtained in the DIP Financing from the DIP Lender pursuant to the DIP Credit Agreement, (B) setting the Final Hearing on the Motion, and granting the Debtors such other and further relief as the Court deems just and proper.

Dated: June 18, 2020
      New York, New York

                                    MAYERSON & HARTHEIMER, PLLC

                                  By:     */s/David H. Hartheimer*
                                            David H. Hartheimer, Esq.
                                            Sandra E. Mayerson, Esq.
                                            Mayerson & Hartheimer, PLLC
                                            845 Third Avenue, 11th Floor
                                            New York, NY 10022
                                            Tel: (646) 778-4382
                                            Fax: (501) 423-8672
                                            david@mhlaw-ny.com
                                            sandy@mhlaw-ny.com

                                            *Proposed Counsel for Debtor and Debtor in Possession*

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>RM BAKERY LLC,<br>      Debtor. | Chapter 11<br><br>Case No. 20-11422 (MG) |
| In re:<br><br>BKD GROUP LLC, [1]<br>      Debtors. | Chapter 11<br><br>Case No. 20-11423 (MG) |

**INTERIM ORDER (I) AUTHORIZING THE USE OF CASH COLLATERAL, (II)
GRANTING ADEQUATE PROTECTION, (III) AUTHORIZING THE DEBTORS TO
OBTAIN POSTPETITION FINANCING, (IV) GRANTING THE LIENS AND
SUPERPRIORITY CLAIMS TO THE DIP LENDER, (V) MODIFYING THE
AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

This matter is before the Court on the motion (the "Motion")[2] of the above-captioned

debtors and debtors-in-possession (collectively, the "Debtors" or the "Company") for entry of an

interim order (the "Interim DIP Order"), and a final order (the "Final DIP Order"), pursuant to

sections 105(a), 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et.*

*seq.* (the Bankruptcy Code"), (i) authorizing the Debtors' continued use of cash collateral pursuant

to section 363 of the Bankruptcy Code; (ii) granting adequate protection for such use of cash

collateral pursuant to sections 361 and 363 of the Bankruptcy Code; (iii) authorizing the Debtors

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number
are as follows: RM Bakery LLC (7954) and BKD Group LLC (0642).

[2] Capitalized terms used but not otherwise defined herein shall have the same meaning ascribed to them in the
Motion.

to obtain secured postpetition financing from FS Lender 2015 LLC (the "<u>DIP Lender</u>" or "<u>Lender</u>"), consisting of a credit facility in the aggregate principal amount of up to $1.0 million (the "<u>DIP Financing</u>" or the "<u>DIP Facility</u>") for the purpose of funding the Debtors' general operating and working capital needs in the administration of the Debtors' chapter 11 cases, in accordance with (a) that certain Debtor in Possession Credit and Security Agreement, (the "<u>DIP Credit Agreement</u>"), substantially in the form attached hereto as <u>Exhibit A</u>, between the Debtors and FS Lender 2015 LLP, and (b) the budget (the "<u>Budget</u>") attached hereto as <u>Exhibit B</u>; (iv) authorizing and approving the Debtors' entry into the DIP Credit Agreement and any other documents, certificates or instruments ancillary thereto, and performance of such other acts as may be necessary or appropriate in connection therewith; (v) granting to the DIP Lender valid, fully perfected, and enforceable security interest and liens (collectively, the "<u>DIP Liens</u>") in and upon the DIP Collateral (as defined in the DIP Credit Agreement) pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code; (vi) granting an allowed superpriority administrative expense claim (the "<u>DIP Superpriority Claim</u>") to the DIP Lender pursuant to section 364(c)(1) of the Bankruptcy Code; (vii) vacating and modifying the automatic stay to the extent necessary to effectuate the terms and provisions of the DIP Credit Agreement and the DIP Orders; and (viii) scheduling a hearing (the "<u>Final Hearing</u>") pursuant to rules 4001(b)(2) and (c)(2) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") to consider entry of the Final DIP Order, authorizing and approving the DIP Financing and use of the cash collateral on a final basis. The Court considered the Motion on an interim basis at the hearing held on June 23, 2020, and after due deliberation in good and sufficient cause appearing for the entry of the within order,

**IT IS HEREBY FOUND, DETERMINE, ORDERED AND ADJUDGED**, that[3]

1.     The Motion is granted on an interim basis in accordance with the terms of this Interim Order. Any objections to the motion with respect to entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of right included therein, are hereby denied and overruled.

2.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of the Debtors' Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.

3.     The Statutory predicates for the relief sought in the Motion are Bankruptcy Code §§ 105, 361, 362, 363, 364, Rule 4001 of the Bankruptcy Rules and Rule 4001–2 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules").

4.     Notice of the Motion for the Preliminary Hearing on the Debtors' proposed Financing and use of cash collateral has been served in accordance with section 102(1) of the Bankruptcy Code and Bankruptcy Rule 4001(b), which notices appropriate and sufficient for all purposes under the Bankruptcy Code and applicable Bankruptcy Rules with respect to the relief requested.

5.     Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraph 29 below), the Debtors admit, stipulate and agree (provided that

---

[3] The findings and the conclusions set forth herein constitute this Court's finding of fact and conclusions of law or pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact as appropriate.

no such stipulation or agreement shall limit, impair or modifying in any way the rights, protections or remedies of the DIP Lender, including with respect to any default or Event of Default under any of the DIP Credit Documents), that:

### (i) Prepetition Credit Documents

#### (a) Pacific Western Bank Credit Documents

A.      On or about May 2, 2013, the predisesor-in-interest to Pacific Western Bank ('Pac West") Square 1 Bank ("Square 1") made a loan to one of the Debtors, RM Bakery LLC ("RMB"), in the original principal amount of $5,000,000 (the "Pac West Loan"). The Pac West Loan was authorized and approved by the U.S. Small Business Administration (the "SBA").  The loan is evidenced by a loan agreement, an SBA note (both dated May 2, 2013), an SBA authorization dated April 10, 2013, and a security agreement dated May 2, 2013. The loan was guaranteed by BKD Group LLC ("BKD"), a Chapter 11 Debtor herein, as well as certain affiliates of RMB, evidenced by certain guarantees, dated May 2, 2013. As of the Petition Date approximately $3,075,000 remains outstanding under the PAC West Loan (the "Pac West Obligations"). To secure the PAC West Obligations, RMB granted Square 1 a security interest in certain equipment, assets and property of RMB, specifically, the Accounts, Chattel, Paper, Instruments, Documents, Inventory, General Intangibles, Equipment, furniture, and Proceeds and Products thereof (collectively the "Pac West Pre-Petition Collateral").

B.      Effective October 6, 2013, Square 1 merged with and into Pac West, by which Pac West became the successor, by merger, of Square 1's rights as original lender

4

under the Pac West Loan. Accordingly, Pac West is now the holder and owner of the Pac West Loan.

(b)    The Mayrich Capital LLC Credit Documents

C.    In June 2017 RMB had the opportunity to enter into a revolving line of credit with the predecessor-in-interest of Mayrich Capital LLC ('Mayrich"), North Mill Capital ("NMC") in the original maximum amount of $1,250,000 (the " Mayrich Loan"). The loan is evidenced by a certain promissory note and security agreement dated May 7, 2017. To secure the Mayrich Loan, RMB granted to NMC a security interest in certain equipment, assets and property of RMB.

D.    On June 8, 2017, NMC and Pac West and entered into an inter-creditor agreement (the "Intercreditor Agreement"). Pursuant to the Intercreditor Agreement, Pac West agreed to subordinate their liens to NMC on Accounts, Inventory, Deposit Accounts, General Intangibles related thereto, and products and proceeds thereof accounts receivable, accounts, inventory and proceeds. NMC, under the Intercreditor Agreement, had a first lien on the above enumerated items (the "Mayrich First Lien Collateral").

E.    The Mayrich Loan has subsequently been sold and assigned to Mayrich, subject to the Intercreditor Agreement. Accordingly, Mayrich has a first lien on the Mayrich First Lien Collateral.

F.    As of the Petition Date, approximately $1,379,537 is outstanding under the Mayrich Loan. As of the Petition Date, the amounts Mayrich is owed is not fully covered

by the Mayrich First Lien Collateral. As a result, Pac West's second lien on inventory and accounts receivable is currently of no value.

6.        The Debtors do not have sufficient unencumbered cash or other assets to continue to operate their business during these Chapter 11 Cases or to effectuate a reorganization. The Debtors will be immediately and irreparably harmed if they are not immediately granted the authority to use Cash Collateral of Mayrich and to obtain postpetition financing from the DIP Lender in accordance with the terms of the DIP Credit Agreement in order to permit, among other things, the orderly continuation of its business, the ability to fund payroll, and payroll taxes, the maintenance of its relations with vendors and suppliers, satisfaction of its working capital needs, as well as the ability to pay taxes, inventory, supplies, overhead, insurance and other necessary expenses. The access of the Debtors to sufficient working capital and liquidity made available through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtors into a successful reorganization of the Debtors.

7.        Despite reasonable efforts, the Debtors have been unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Credit Agreement and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting the DIP Lender, subject to the Carve-out (defined below), the DIP Liens and the DIP Superpriority claim under the terms and conditions set forth in this Interim Order and in the DIP Credit Agreement.

8.      The terms of the DIP Facility proposed by the DIP Lender are fair and reasonable, and the best available under the present circumstances, reflect the Debtors' exercise of prudent business judgment consistent with its fiduciary duties and are supported by reasonably equivalent value and consideration. The postpetition financing under the DIP Facility has been entered into in good faith by and among the Debtors and the DIP Lender; and the postpetition financing to be provided by the DIP Lender has been extended in good faith is a term is used in section 364(e) of the Bankruptcy Code,

9.      Based on the record before the Court, the terms of the use of Cash Collateral and the adequate protection granted in this Order had been proposed in good faith, as that term is used in section 364(e and are in the best interest of the Debtors, their estate, and creditors in our consistent with the Debtors' fiduciary duties.

10.     The DIP Lender is willing to provide the DIP Facility subject to the conditions set forth herein and in the DIP Credit Documents, including without limitation, the provision of this Interim Order assuring the Super Priority Claims (defined below), Adequate Protection Superpriority Claims (defined below), Adequate Protection Liens (defined below), and other protections granted pursuant to this Interim Order and the DIP Credit Documents will not be affected by any subsequent reversal or modification of this Interim Order or any other order which is applicable to the DIP Facility, to the extent provided in section 364(e) of the Bankruptcy Code.

11.     The Debtors' have requested the immediate entry of this order pursuant to Bankruptcy Rule 4001(b) and (c), and Local Rule 4001-2. Absent the entry of this Order, the Debtors and their estates will be immediately and irreparably harmed.

12.     Subject to the terms and conditions contained in this Interim Order, the Debtors are hereby expressly authorized and directed to execute and deliver to the DIP Lender any DIP Credit Documents including the DIP Credit Agreement and such additional documents, instruments and agreements as may be reasonably required by the DIP Lender to implement the terms and effectuate the purpose, of this Interim Order. The terms and conditions of the DIP Credit Agreement, are hereby approved and ratified in the debtor is authorized and directed to comply with and perform all the terms and conditions contained therein. The failure to reference would discuss any particular provision of the DIP Credit Agreement in this Interim Order shall not affect the validity or the enforceability of any such provision. In the event of a conflict between this Interim Order and the DIP Credit Agreement, the terms of this Interim Order shall govern.

13.     The Debtors are hereby authorized to obtain postpetition financing from the DIP Lender in accordance with the terms of this Interim Order, the DIP Facility, and the Budget up to the principal amount of $100,000 pursuant to section 364(c) of the Bankruptcy Code pending the final hearing scheduled for_____, 2020 (the "Final Hearing").

14.     In accordance with sections 364(c)(1) and 507(b) of the Bankruptcy Code and subject to the Adequate Protection Superpriority Claims (defined below), all DIP Obligations under the DIP Facility shall constitute claims (the "DIP Superpriority Claims") with priority in payment over any and all administrative expense of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(b), 546(c), 1113 and 1114 of the Bankruptcy Code and shall at all times be senior to the rights of the Debtors, any successor trustee to the extent permitted by law, or any other creditor in the Chapter 11 Cases.

15.      As security for the Debtors' DIP Obligations arising under or in connection with the DIP Credit Agreement, the DIP Lender is hereby granted first priority liens and security interest pursuant to section 364(c)(2) of the Bankruptcy Code on all of the DIP Collateral (as described in the DIP Credit Agreement) of the Debtors that is made subject to the security interest granted to the DIP Lender under the DIP Facility that is not encumbered as of the Petition Date, including any and all avoidance power actions the Debtors have under section 544 through 551, and section 553, of the Bankruptcy Code (the "Avoidance Power Actions") but subject to (i) the "Carve-out" (ii) the valid and perfected security liens or security interest existing on the Petition Date (which are currently held by Pac West and Mayrich), (iii) the Replacement Liens and (iv) the Adequate Protection Liens.

16.      In the event the adequate protection provided to Mayrich does not preserve the value of the Mayrich Collateral as of the Petition Date, then Mayrich shall have a Superpriority claim pursuant to section 507(b) of the Bankruptcy Code, having priority over all claims allowed under section 507(a) of the Bankruptcy Code, but junior to the Superpriority claim of the DIP Lender, to the extent of the failure to preserve such value.

17.      Additionally, as security for the Debtors' DIP Obligations arising under or in connection with the DIP Credit Documents, the DIP Lender is hereby granted, pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, a perfected lien and security interest in all of the DIP Collateral (as defined in the DIP Credit Agreement) of the Debtors junior in priority only to valid and perfected liens or security interest held by Pac West and Mayrich.

18.      The DIP Liens granted to the DIP Lender pursuant to this Interim Order and the DIP Facility or deemed valid and perfected upon the entry of this Interim Order without the

necessity of the DIP Lender taking possession of, filing financing statements, mortgages, or other documents. Upon the request of the DIP Lender, the debtors shall execute and deliver to the DIP Lender any and all UCC financing statements, mortgages, notes, assignments, or other instrument or document considered by the DIP Lender necessary in order to perfect the DIP Liens; and the DIP Lender is hereby granted relief from the automatic stay embodied in section 362(a) of the Bankruptcy Code to receive, file, and record the foregoing.

19.    The Debtors are hereby authorized to use Cash Collateral of Mayrich pursuant to and in accordance with the terms of this Interim Order and Budget. Until the Final Hearing, as adequate protection for the Debtors' use of Cash Collateral of Mayrich, Mayrich is hereby granted a replacement security interest in the accounts receivable, inventory and accounts in the same priority as Mayrich had prepetition (the "Replacement Lien").

20.    The Debtors are hereby authorized to use the Equipment pursuant to and in accordance with the terms of this Interim Order. Until the Final Hearing, as adequate protection for the Debtors' use of the Equipment, Pac West is granted a replacement lien in machinery and Equipment, in the same priority as it had prepetition (the "Adequate Protection Liens)".

21.    The Replacement Liens, and the Adequate Protection Liens as well as the security interest granted Pac West and Mayrich, are deemed valid and perfected upon entry of this Interim Order without the necessity of Pac West or Mayrich taking possession of, filing financing statements, mortgages or other documents. Upon the request of Pac West or Mayrich, the Debtors shall execute and deliver to Pac West and Mayrich, any and all UCC financing statements, mortgages, notes, assignments, or the other instrument or document considered by Pac West or Mayrich necessary in order to perfect the Adequate Protection Liens and the Replacement Lien;

and Pac West and Mayrich are hereby granted relief from the automatic stay embodied in 362(a) of the Bankruptcy Code to receive, file, and record the foregoing.

22.     As additional adequate protection for Pac West, the Debtors shall pay Pac West four percent (4%) per annum, (the non-default rate specified under the PAC West Facility) of the maximum value of the Equipment, which at most is worth $448,500, on a monthly basis.

23.     Furthermore, the Debtors shall provide counsel to  Mayrich all reports that are submitted to the DIP Lender pursuant to section 10 of the DIP Credit Agreement, at or about the same time that such reports are provided to the DIP Lender.

24.     Neither the Debtors nor any other person shall assert a claim under section 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection or enhancement of or realization by the DIP Lender, Mayrich upon the DIP Collateral, the Mayrich Collateral or the collateral subject to the Replacement Liens or for any expense of administration of the estate.

25.     No cost or expense of administration under sections 105, 364(c)(1), 503(b), 506(c), 507(b), 726 (to the extent permitted by law), 1113, 1114 or otherwise of the Bankruptcy Code, shall be senior to, equal to or *pari passu* with, the Superpriority Claims of the DIP Lender arising out of the DIP Obligations, or, thereafter, the Adequate Protection Superpriority Claims of Mayrich.

26.     Notwithstanding anything to the contrary contained anywhere in this Interim Order and/or the DIP Credit Agreement, the Mayrich Collateral and all collateral which is made subject to the Security interest and liens granted to the DIP Lender, and Mayrich, pursuant to the terms of

11

this Interim Order shall be subject to a carve-out (the "Carve-out") for the sum of allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6) and Priority Professional Expenses. "Priority Professional Expenses" means allowed fees, costs and reasonable expenses allowed or permitted pursuant to sections 330 and 331 of the Bankruptcy Code of (a) professionals retained by the Debtors and (b) any professionals retained by any Committee that may be appointed in these Chapter 11 Cases, up to the amount of $100,000 (in the aggregate for both Debtors' professionals and Committee's professionals).

27.    Upon the occurrence of an Event of Default contained in the DIP Credit Agreement, the DIP Lender may declare all DIP Obligations owing under the DIP Facility to be immediately due and payable and may declare a determination of any further obligation to extend credit to the Debtors and exercise all other remedies as set forth in section 13 of the DIP Credit Agreement. Upon the occurrence of an Event of Default and following the giving of five (5) business days' notice to counsel for the Debtors, counsel for any Committee appointed in these Chapter 11 Cases, and the United States Trustee, the DIP Lender shall have immediate relief from the automatic stay and foreclose on all or any portion of the DIP Collateral, or otherwise exercise remedies against the DIP Collateral, as permitted by applicable non-bankruptcy law and the Debtors' right to use Cash collateral shall cease. During such five-business-days' notice., The Debtors in any appointed Committee shall be entitled to an emergency hearing with this Court for the sole purpose of contesting whether an Event of Default has occurred.

28.    Pursuant to 364(e) of the of the Bankruptcy Code, if any or all of the provisions of this Interim Order or hereinafter modified, vacated or stayed, such stay, modification or vacation shall not affect the validity of any obligation indebtedness security interest or liens granted by the Debtors to the DIP Lender, Pac West, Mayrich, prior to the effective date of any such stay,

modification or vacation, or the validity and enforceability or priority of any Lien or security interest authorized, granted or created pursuant to this Interim Order.

29.     The entry of this Interim Order is without prejudice to the rights of any party in interest, including the Official Committee of Unsecured Creditors (the "Committee"), if any, appointed in these Chapter 11 Cases, to challenge the prepetition liens of Mayrich, Pac West, to the extent such a right exists, provided however, any challenges to the validity, extent or priority of the liens or claims of Mayrich, including the assertion of any claim under section 510, 544, 547, or 548 of the Bankruptcy Code (collectively, "Challenges") must be commenced, subject to obtaining standing, within sixty (60) days after the appointment of the Committee, but in no event later than within seventy-five (75) days from the Petition Date (the "Challenge Deadline"). Any and all Challenges by any party (including any Chapter 11 or Chapter 7 trustee) shall be forever barred unless brought by the Committee on or before the Challenge Deadline.

30.     The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender, Pac West, Mayrich, and the Debtors and their respective successors and assignees (including any trustee or other fiduciary hereinafter appointed as legal representative of the Debtors or with respect to the property of the estate of the Debtors) whether in these Chapter 11 Cases, in any subsequent cases under chapter 7 of the Bankruptcy Code, or upon dismissal of any such Chapter 11 or chapter 7 case.

31.     The provisions of this Interim Order shall be immediately effective upon its entry by the Bankruptcy Court as provided for in Bankruptcy Rule 6004(g) and 7062.

32.     The Final Hearing on the Motion is scheduled for _____, 2020, at ____ _.m (ET, before the Honorable Martin Glenn, U.S.B.J., at the United States Bankruptcy Court for the

Southern District of New York, 1 Bowling Green, New York, NY 10004, or, due to the current coronavirus pandemic, the Final Hearing may be heard telephonically, using Court Solutions to facilitate appearances.

33.     The Debtors shall promptly mail copies of this Order (which shall constitute adequate notice of the Final Hearing) to the parties that were given notice of the Interim Hearing, to any other party that has filed a request for notices with the Court, and to counsel to the Committee after its formation (if any).  Any party-in-interest objecting to the relief sought at the Final Hearing shall file written objections, and serve them on the counsel for the Debtors', counsel for the Committee (if appointed), the DIP Lender or its counsel, counsel for Mayrich Capital LLC, counsel for Pacific Western Bank, and the Office of the United States Trustee, in each case on or before _____, 2020 at __:__ ___.m

34.     The provisions of this Interim Order or non-severable and mutually dependent.

Dated: June ___, 2020

_____
HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

14

# EXHIBIT A

## DEBTOR-IN-POSSESSION
## CREDIT AND SECURITY AGREEMENT

**THIS CREDIT AND SECURITY AGREEMENT** (this "Agreement"), is made by and among and entered into as of June 15, 2020 (the "Agreement Date"), by RM Bakery, LLC ("RM Bakery") and BKD Group, LLC ("BKD"), as borrowers (RM Bakery and BKD are together referred to as the "Debtors" or "Borrowers"), FS Lender 2015 LLC, as lender (the "DIP Lender") and Mayrich Capital LLC ("Mayrich" and together with the Debtors and the DIP Lender, the "Parties") .

### WITNESSETH:

**WHEREAS**, the Borrowers plan to commence proceedings under Chapter 11 of the Bankruptcy Code in June 2020, by filing voluntary petitions for relief with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Both Debtors will retain possession of their assets as is authorized under sections 1107 and 1108 of the Bankruptcy Code and to continue in the management and operation of their businesses as debtors-in-possession. The Debtors plan to file a motion to administratively consolidate the two bankruptcy cases (collectively, the "Cases");

**WHEREAS**, both Debtors requested that the DIP Lender provide, and the DIP Lender is willing to provide, subject to the terms and conditions of this Agreement, and any other DIP Credit Documents, and the approval of the Bankruptcy Court, a debtor-in-possession financing facility to the Borrowers that will supplement the Debtors use of cash collateral to provide working capital and to pay other expenses permitted under this Agreement in an aggregate principal amount of up to one million dollars ($1,000,000.00) outstanding (the "Maximum Commitment");

**WHEREAS**, the Debtors plan to file a motion with the Bankruptcy Court upon the filing of the Cases, which among other things, will seek authorization for the Debtors to enter into the DIP Credit Documents, including this Agreement;

**WHEREAS** the Parties to this Agreement have reached certain mutual understandings and agreements with respect to the matters as set forth in this Agreement, subject to approval of the Bankruptcy Court, and each of the Parties believe it to be in their respective best interest to set forth the terms of such mutual understandings and agreements as provided in this Agreement.

**NOW THEREFORE**, in consideration of the premises and mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement, intending to be legally bound, hereby agree as follows:

Section 1.    Definitions.  As used in this Agreement the following terms have the meaning as set forth in this Section 1:

(a)    "Account" has the meaning assigned to such term in the UCC.

1

(b)      "<u>Additional Draw</u>" has the meaning set forth in Section 2(a)(iii).

(c)      "<u>Adequate Protection Lien</u>" means the replacement lien provided to secured creditors, pursuant to section 361 of the Bankruptcy Code, to allow a debtor in bankruptcy to use such secured creditors collateral, while simultaneously protecting said secured creditor from the possible diminution in value of their collateral. For adequate protection for Pac West, the Debtors are providing Pac West with a replacement lien in machinery and Equipment, in the same priority as it had prepetition. Prepetition, Pac West also had a lien on the accounts receivable, inventory and accounts of RM Bakery, but since the Debtors owe Mayrich amounts in excess of the value of their collateral, Pac West subordinate position had no value as of the Petition Date. Accordingly, the Debtors are only providing adequate protection respect to their lien on machinery and Equipment. In addition, the Debtors will pay Pac West four percent (4%) per annum, of the maximum value of the Equipment, which at most is worth $448,500, on a monthly basis.

(d)      "<u>Applicable Rate</u>" means 10 percent (10%) per annum, compounded annually.

(e)      "<u>Authorized Officer</u>" means, any Person that is deemed to be an Authorized Officer for purposes of this Agreement.

(f)      "<u>Business Day</u>" means a day other than Saturday, Sunday, or other day on which commercial banks in the State of New York are authorized or required by law, or other governmental action, to close.

(g)      "<u>Carve-out</u>" means an agreement between a secured creditor and a debtor, providing that a portion of the secured creditor's collateral may be used to pay administrative expense of a bankruptcy case. In these Cases, the DIP Lender and Mayrich have agreed to provide the Debtors a Carve-out in the amount of $100,000.00.

(h)      "<u>Cash Collateral</u>" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents, in which an entity other than the estate (such as a secured creditor) have an interest. While both Pac West and Mayrich have a secured interest in the Debtors' cash and accounts receivables, (i) Pac West's secured interest in these assets is junior to Mayrich's interest, and (ii) the value of the Debtors' cash and accounts receivable is less than the amount of Mayrich's claim, putting Cap West's interest in these assets "out of the money". Therefore, only Mayrich has a current secured interest in the Cash Collateral of the Debtors. Mayrich has consented to the Debtors use of its Cash Collateral during the pendency of these Cases.

(i)      "<u>Change of Control</u>" means any one or more of the following events:

(i)      the transfer (in any one transaction or series of transactions) of all or substantially all of the assets of one or more Debtors to any Person or Persons; and

2

(ii)      the liquidation or dissolution of either Debtor or the adoption of a plan by the stockholders, members, or holders of similar rights of the Debtors relating to the dissolution or liquidation of the Debtors.

(j)      "<u>Closing Date</u>" means the date that the Initial Draw is paid to the Debtors.

(k)      "<u>Committee</u>" means any statutory committee of unsecured creditors of the Debtors appointed by the United States Trustee for the District where the Cases are pending (if any).

(l)      "<u>Commitment Fee</u>" means an amount equal to two percent (2%) of the Maximum Commitment, that is payable to the DIP Lender within seven (7) days of the Final Order Entry Date. The Commitment Fee will be included in the Formation Expenses.

(m)      "<u>Default</u>" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

(n)      "<u>Deposit Account</u>" means any deposit account (as such term is defined in the UCC) including, a demand, time, savings, passbook, or like account with a bank, savings and loan association, credit union, or like organization, other than an account evidenced by a negotiable certificate of deposit.

(o)      "<u>DIP Budget</u>" means the consolidated ninety (90) day rolling budget provided by the Debtors from time to time, the first of which is annexed to this Agreement as **Exhibit A**, all in accordance with this Agreement including the provisions contained in <u>Sections 8(a)(v) and 10(c)</u>.

(p)      "<u>DIP Collateral Documents</u>" means all instruments, documents, and agreements (including this Agreement) delivered by either Debtor pursuant to this Agreement or the other DIP Credit Documents pursuant to which either Debtor grants a DIP Lien, or any other Lien, or encumbrance, to the DIP Lender, as any of the foregoing may be amended, restated, supplemented, or modified, from time to time.

(q)      "<u>DIP Collateral</u>" means as security for the DIP Obligations, effective and perfected on the Interim Order Entry Date without the necessity of the execution, recordation of filings by the Debtors of security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Lender, the security interests and the liens granted to the DIP Lender as set forth in <u>Section 3</u> of this Agreement for the benefit of the DIP Lender pursuant to a DIP Interim Order, DIP Final Order and/or the other DIP Credit documents (collectively, the "<u>DIP Liens</u>").

(r)      "<u>DIP Credit Documents</u>" means this Agreement, the Financing Order, the DIP Note (if any), the DIP Collateral Documents, and all other documents, instruments or agreements signed and delivered by either Debtor for the benefit of the DIP Lender in connection with the transaction contemplated by this Agreement and other DIP Credit Documents.

(s)      "<u>DIP Draw Request Date</u>" means the date that the Debtors request an Initial Draw or Additional Draw from the DIP Lender pursuant to the DIP Loan.

(t)      "<u>DIP Final Order</u>" means a final order (which must be acceptable in form and substance to the DIP Lender and Mayrich in their reasonable discretion) entered, or to be entered by the Bankruptcy Court authorizing on a final basis the secured financing under this Agreement and the other DIP Credit Documents.

(u)      "<u>DIP Interim Order</u>" means one or more interim orders in form(s) acceptable to the DIP Lender and Mayrich in their reasonable discretion, entered by the Bankruptcy Court authorizing the secured financing under this Agreement and other DIP Credit Documents.

(v)      "<u>DIP Lien</u>" means any Lien granted pursuant to this Agreement, any DIP Collateral Documents, the other DIP Credit Documents, or any Financing Order.

(w)      "<u>DIP Loan</u>" has the meaning given such term in <u>Section 2</u>.

(x)      "<u>DIP Obligation</u>" means all Indebtedness, obligations, and liabilities of either Debtor, from time to time, owed to the DIP Lender directly or indirectly, jointly or severally, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law, or otherwise, arising or incurred under this agreement, the Financing Orders, or any other DIP Credit Documents, or in respect of the DIP Loan, the DIP Note, or any others instruments at the time evidencing any of the foregoing.

(y)      "<u>Equipment</u>" means, as to either Debtor, all of such Debtors now owned and hereinafter acquired equipment, wherever located, including machinery, data processing, and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessories and property now or hereafter affixed thereto, or used in connection therewith, any substitution and replacement thereof, wherever located, and all leasehold interests Debtors may have in same.

(z)      "<u>Event of Default</u>" means each of the conditions or events as set forth in <u>Section 12</u>.

(aa)      "<u>Excess Cash</u>" means cash in the amount of more than ten percent (10%) of the cash that is projected in the DIP Budget for that relevant period.

(bb)      "<u>Final Order Entry Date</u>" means the date on which the Bankruptcy Court enters the DIP Final Order.

(cc)      "<u>Financing Order</u>" means collectively, any DIP Interim Order, the DIP Final Order, and such other orders relating thereto or authorizing the granting of credit by the DIP Lender to the Debtors on an emergency, interim, or permanent basis, pursuant to section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Cases.

(dd)    "Indebtedness" means with respect to any Person, without duplication, the following:

(i)    all indebtedness of such Person for borrowed money;

(ii)    all obligations of such Person for the deferred purchase price of property or services, other than accounts payable and accrued liabilities that would be classified as current liabilities which payables and liabilities are incurred in respect of property or services purchased in the ordinary course of business if and only for so long as no item of such accounts payable and accrued liability is more than 90 days past due;

(iii)    all obligations of such Person evidenced by notes, bonds, debentures, or similar notes or Securities instruments;

(iv)    all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person;

(v)    all obligations of such Person as lessee under Capital Leases;

(vi)    all obligations of such Person secured by Liens on the assets and property of such Person;

(vii)    all obligations of such Person to purchase, redeem, retire, defease, or otherwise make any payment in respect of any Capital Stock or other ownership or profit interest in such Person or any other Person or any warrants, rights, or options to acquire such Capital Stock;

(ee)    "Initial Draw" has the meaning given such term in Section 2(a)(ii).

(ff)    "Interim Order Entry Date" means the date on which the Bankruptcy Court enters the DIP Interim Order.

(gg)    "Lien" means any mortgage, deed of trust, security interest, charge, pledge, hypothecation, assignment, attachment, deposit arrangement, encumbrance, lien (statutory, judgment, or otherwise, but excluding any right of set-off arising by operation of law or pursuant to agreements entered into in the ordinary course of business), or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any Capital Lease, any financing lease involving substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC or comparable law of any jurisdiction in respect of the foregoing).

(hh)   "Maturity Date" means, unless some other date is agreed to in writing by the Parties, the earlier of:

(i)   the date on which a plan of reorganization for either of the Debtors confirmed by the Bankruptcy Court becomes effective,

(ii)   the day on which the DIP Obligations become immediately due and payable pursuant to the terms of this Agreement, or by Court order, and

(iii)   the date that substantially all of the assets of RM Bakery are sold, transferred or alienated in any way.

(ii)   "Mayrich Collateral" means all or of the following assets, properties, rights and interests of RM Bakery, whether now owned or existing, or hereinafter acquired or arising: all Accounts, all inventory, all general intangibles relating (specifically and only) to RM Bakery's Accounts and inventory (including, without limitation, all purchase orders, software and RM Bakery's books), or Supporting Obligations (specifically and only) with respect to the foregoing, or Deposit Accounts, all money or assets of RM Bakery, which hereinafter come into the possession, custody or control of Mayrich, in connection with the foregoing Collateral; all proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing; any and all tangible or intangible property resulting from the sale, lease, license or other disposition of any of the foregoing, or any portion thereof or interest therein, in all proceeds thereof; and any other asset of RM Bakery which may hereinafter be subject to a lien in favor of Mayrich as security for the Obligations. All of the foregoing is subject to a certain inter-creditor agreement between Mayrich and Pac West.

(jj)   "Monthly Operating Report" means the report that all debtors in chapter 11 are required to file on a monthly basis which is designed to reflect changes in the financial position of a debtor during the pendency of a Chapter 11 case. Each report is a sworn statement by the respective debtor and must be as accurate as possible.

(kk)   "Pac West" means Pacific Western Bank.

(ll)   "Permitted Variances" means the variance from the DIP Budget for one budget period of not more or less than 10% per item and 15% overall.

(mm)   "Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, other legal entities and Government Bodies.

(nn)   "Petition Date" means the date on which the Debtors commence the Cases by filing petitions pursuant to chapter 11 of the Bankruptcy Code.

(oo)   "Post-Petition" means any date following the Petition Date.

(pp)    "Pre-existing Lien" means the valid, perfected and enforceable liens existing prior to the Petition Date.

(qq)    "Principal Office" means, for the DIP Lender, its office is located at 220 East Forty 42nd Street, New York, NY 10017 , or such other office as the DIP Lender may on one or more occasions designate in writing to the Borrower.

(rr)    "Replacement Lien" means a post-petition lien provided to a lender covering property acquired by the debtor after the bankruptcy filing. Lenders are often entitled to adequate protection of their interests in collateral, when a debtor proposes to use or sell the collateral. Mayrich has made a secured loan to RM Bakery in the amount of $1,300,000.  As part of the financing package, the Debtors are giving Mayrich a replacement lien in the accounts receivable, inventory and accounts in the same priority as Mayrich had prepetition.

(ss)    "Superpriority Claims" means, as additional protection for the DIP Lender, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations will constitute allowed claims against the Debtors (without the need to file any proof of claim) with priority over any and all administrative expenses, diminution claims, and all other claims against the Debtors, now existing or hereinafter arising, of any kind whatsoever, including, all administrative expenses of the kind specified sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under section 105, 362, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment, which allowed claims will be payable from and have recourse to all pre-petition and Post-petition property of the Debtors and proceeds thereof, subject only to the Pre-existing Liens, any Replacement Liens therefor and the Carve-out.

Section 2.    DIP Loan.

(a)    The DIP Loan Draws.  Subject to the terms and conditions set forth in this Agreement and the Financing Orders, the DIP Lender will make advances available to the Debtors pursuant to this Section 2(a) (the "DIP Loan"):

(i)    Maturity Date.

(1) the DIP Loan and all DIP Obligations will be due and owing to the DIP Lender on the Maturity Date.

(ii)    Initial Draw.   Subject to the terms and conditions of this Agreement, immediately upon entry by the Bankruptcy Court of the DIP Interim Order, an amount equal to the DIP Budget for the next thirty (30) days will be transferred to the Borrowers from the DIP Loan, for the benefit of both Debtors, to be used by the Debtors solely in accordance with the DIP Interim Order, DIP Budget (including Permitted Variances), the use of proceeds as set forth in Section 2(b), and the other provisions of this Agreement (the "Initial Draw").

7

(iii)    <u>Additional Draws</u>.

(1)    If and only if the DIP Final Order has been entered by the date which is thirty (30) days after the Petition Date, or by such other date as the Parties may agree in writing, and there is no Event of Default continuing, then every thirty (30) days after the Initial Draw, the Debtors may make an additional draw in an amount not to exceed the DIP Budget for the next thirty (30) days plus 10% thereof; provided, that such draw does not exceed the Maximum Commitment. If prior to the time for an Additional Draw, the Debtors have a need for additional cash, they may borrow such cash with the DIP Lender's permission; provided that, such draw does not exceed the Permitted Variances.  All draws must be used solely in accordance with the DIP Budget, as modified by the Permitted Variances. If money is drawn in a particular thirty (30) day period (each thirty (30) day period, a "<u>Budget Period</u>") and is not spent in that Budget Period, but is spent in the immediately preceding or immediately subsequent Budget Period for the purpose set forth in the DIP Budget for such Budget Period, such expenditure will be deemed to have been made in accordance with the DIP Budget and will not create a variance.

(2)    Upon an Event of Default and during the continuance of an Event of Default, the Debtors may not request advances under the Additional Draw, without the express written consent of the DIP Lender.

(3)    Each Additional Draw must be on no less than one (1) Business Day notice by the Debtors to the DIP Lender.

(b)    <u>Use of Proceeds</u>.   The DIP Loan and proceeds thereof will be used by the Debtors solely for the purposes as set forth in this Agreement and the DIP Budget.

(c)    <u>Evidence of Debt</u>.

(i)    The DIP Interim Order and/or the DIP Final Order and this Agreement constitute sufficient evidence without any further documentation of (a) the Debtors' indebtedness and obligations to the DIP Lender hereunder and of the DIP Lender's liens and security interest in the DIP Collateral; (b) the Debtors' indebtedness and obligations to Mayrich for the Replacement Lien hereunder and of Mayrich's liens and security interest in the Mayrich Collateral; and (c) the Debtors' obligations under the Adequate Protection Lien. Notwithstanding the foregoing, upon the request of the DIP Lender, Mayrich or Pac West, the Debtors will execute such other evidence of indebtedness and Liens as requested, including promissory notes, UCC filings, and the like, provided, such evidence of indebtedness is consistent with the terms of this Agreement and any DIP Interim Order(s) and the DIP Final Order.

(ii)    As evidence of each draw and repayment, the DIP Lender shall maintain a chart substantially in the form attached hereto as **<u>Exhibit B</u>**, and Debtors will initial the amount of each draw and each repayment, and such chart is deemed conclusive evidence of the amount outstanding.  Upon reasonable notice, a representative of the Debtors or the Committee may inspect said chart at the DIP Lender's Principal Office.

      (d)     <u>Interest on the DIP Loan; Payment</u>.

      (i)     <u>Applicable Rate</u>.  Except as otherwise set forth in this Agreement, the DIP Loan will bear interest on the unpaid principal amount outstanding from the date made through repayment, whether by acceleration or otherwise, at the Applicable Rate.

      (ii)     <u>Interest Calculation</u>.

      (1)     Interest payable pursuant to this Agreement will be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.

      (2)     In computing interest on the outstanding principal balance of the DIP Loan, the date the making of an advance under the DIP Loan will be included, and the date of any repayment of the DIP Loan will be excluded.

      (iii)     <u>Cash Interest</u>.  Accrued and unpaid interest on the DIP Loan will be payable in arrears on:

      (1)   the first day of each calendar month, and if such day is not a Business Day, the immediately preceding Business Day; or

      (2)   the Maturity Date.

      (e)     <u>Default Interest</u>.

      (i)     Upon the occurrence and during the continuance of an Event of Default, the principal amount of the DIP Loan and, to the extent permitted by applicable law, any interest payments on the DIP Loan, or other amounts owed under this Agreement that are not paid when due, in each case, whether at stated maturity, by notice of prepayment, by acceleration, or otherwise, will thereafter bear interest payable on written demand (or automatically upon the occurrence and during the continuance of an Event of Default) at the Applicable Rate <u>plus</u> 300 basis points.

      (ii)     Payment or acceptance of the increased rate of interest provided for in <u>Section 2(e)(i)</u> is not a permitted alternative to timely payment and will not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the DIP Lender.

      (iii)     All amounts due and owing to the DIP Lender under this Agreement and the other DIP Credit Documents will be paid in U.S. currency, by wire transfer in immediately available funds, to the DIP Lender's account as the DIP Lender may inform the Debtors on one or more occasions.

(f)     No Prepayment Penalty.  There shall be no prepayment penalty on the DIP Loan. Therefore, any payments made by the Debtors, at any time, for any reason, shall be without penalty or premium.

(g)     Optional Repayment of Loan.  The Debtors shall have the right at any time, and from time to time, to pay any amounts borrowed by them, in whole and/or in part.  Any payment made at any time shall be applied to the outstanding principal balance of the Debtors' Indebtedness. Such payment, and reduction of Debtors' outstanding principal balance, will increase its current available borrowing base of amounts currently available to the Debtors to draw upon, up to the Maximum Commitment.

(h)     Mandatory Repayment of Loan.  At the end of any Month, prior to the Maturity Date, in the event the Debtors have Excess Cash on hand, the Debtors shall pay to the DIP Lender an amount equal to the amount of Excess Cash on hand. Any payment made pursuant to this Section shall be applied to the Debtors outstanding principal balance of the DIP Loan. Such prepayment, and corresponding reduction of the Debtors' outstanding principal balance, will make available those amounts for the Debtors' borrowing base up to the amount of the Maximum Commitment.

Section 3.     DIP Liens and Protections. Both of the Debtors hereby grant and convey to the DIP Lender, subject to the entry of the Financing Orders, the following Liens and protections to secure the DIP Obligations:

(a)     Pursuant to section 364(c)(2) of the Bankruptcy Code,  and subject to Section 3(b), the DIP Lender is hereby granted and will be secured by a valid, binding, continuing, enforceable and fully perfected first priority security interest and Lien on all pre- and post-petition property of the Debtors and/or interest of the Debtors in property, whether existing on the Petition Date or hereafter acquired, that, on or as of the Petition Date or the date acquired (if after the Petition Date) is not subject to valid, perfected and non-avoidable Liens, including, all cash and cash collateral of the Debtors (whether maintained with the DIP Lender or otherwise) and investment of such cash and cash collateral, all inventory, all Accounts, other rights to payment whether arising before or after the Petition Date, all chose in action, all avoidance power actions the Debtors have, or will have, under section 544 through 551, in section 553, of the Bankruptcy Code, books and records, investments, all real estate, all contracts, all properties, Equipment, general intangibles, documents, instruments, all vehicles, or Deposit Accounts, all goods, work in progress, all fixtures, all finished goods, or chattel paper, investment property, in all leaseholds, or real properties), all patents, or copyrights, trademarks, or tradenames, other Intellectual Property, capital stock of subsidiaries, other capital stock, and the proceeds rents, profits, accessions, substitutions, insurance proceeds, warranty and indemnity proceeds, and all other product, offspring, or profits of all of the foregoing (collectively, the "Secured Assets").

(b)     Pursuant to section 364 (c)(3) and (d)(1) of the Bankruptcy Code, the DIP Obligations owed to the DIP Lender will be secured by a valid, binding, continuing, enforceable, and fully protected security interest and Lien in all the Secured Assets, junior in priority only to (i) the "Carve-out" (to be ordered in the DIP Interim Order and the DIP Final Order), (ii) the

10

valid and perfected security liens or security interest existing on the Petition Date (which are currently held by Pac West and Mayrich), (iii) the Replacement Liens and (iv) the Adequate Protection Liens.

(c)     Pursuant to Section 364(c)(1) of the Bankruptcy Code, the DIP Obligations will at all times constitute joint and several Superpriority Claims in the Cases.

Section 4.     Payment Obligations.

(a)     On the Maturity Date, whether by acceleration or otherwise of any of the DIP Obligations under this Agreement or the other DIP Credit Documents, the DIP Lender will be entitled to immediate payment of the DIP Obligations without further application to or order of, the Bankruptcy Court.

`        (b)     Additionally, the Debtors will be permitted to make payments to the DIP Lender at any time, of both interest and principal. To the extent such payments are made, amounts paid to the DIP Lender that reduce the Principal Balance outstanding, such amounts will be made available for the Debtors to re-borrow under the Maximum Commitment. For the avoidance of doubt, the Maximum Commitment is for the term of the DIP Loan, and amounts repaid on the DIP Loan during the pendency of the DIP Loan will reduce the Principal Balance for all purposes, including for calculation of interest as well as calculation of amounts remaining available under the Maximum Commitment.

Section 5.     Cash Collateral.

(a)     Consent to Use Cash Collateral. By Mayrich entering into this Agreement, it agrees to allow the Debtors to use Mayrich's Cash Collateral through the Maturity Date. This agreement to allow use of its Cash Collateral is in exchange for the Debtors providing Mayrich with the Replacement Lien.

(b) Consent to Carve-out and Sections 506(c) and 522(b) Waivers.

(i)     In these Cases, the DIP Lender and Mayrich have agreed to provide the Debtors a Carve-out in the amount of $100,000.00. In exchange for the DIP Lender and Mayrich providing the Carve-out, the Debtors release both the DIP Lender and Mayrich from additional claims against its collateral pursuant to section 506(c) and section 522(b) of the Bankruptcy Code.

(iii)     In exchange for the DIP Lender and Mayrich providing the Carve-out, as well as Mayrich allowing the use of Cash Collateral, no claim shall be brought against the DIP Lender or Mayrich to recover any expenses under section 506(c) of the Bankruptcy Code, or to determine that any of the Prepetition Collateral or the Post-petition Collateral may be free and clear of Mayrich's interest based on the equities of the case under section 552(b) of the Bankruptcy Code.

11

(c)      <u>Mayrich May Withdraw its Consent to Use Cash Collateral</u>.  Upon an Event of Default, on seven (7) days' notice, Mayrich may withdraw its consent to the Debtors' use of Cash Collateral.

(d)      <u>Acknowledgement of Mayrich's Claim</u>.  Mayrich has made a secured loan to RM Bakery in the amount of $1,300,000.  The Debtors fully acknowledges the liens and perfection of Mayrich's secured pre-petition debt, as well as acknowledges that Mayrich's secured claim is in the amount of $1,300,000. As part of the financing package, the Debtors are giving Mayrich a replacement lien in the accounts receivable, inventory and accounts in the same priority as Mayrich had prepetition. Additionally, the Debtors will provide interest to Mayrich on the terms of its pre-petition loan at the non-default, contract interest rate (the "Mayrich Interest"). The Debtors at their option will either (i) pay the Mayrich Interest to Mayrich during the pendency of the Cases or (ii) the Mayrich Interest will accrue during the pendency of the Cases. For the avoidance of doubt, the Debtors' failure to pay Mayrich the Mayrich Interest during the pendency of the Cases, will not be an Event of Default.  In return for the forgoing, Mayrich has consented to the use of cash collateral.

(e)      <u>Mayrich's is Granted a Superpriority Claim</u>.  In the event the adequate protection provided to Mayrich does not preserve the value of the Mayrich Collateral as of the Petition Date, then Mayrich shall have a Superpriority claim pursuant to section 507(b) of the Bankruptcy Code, having priority over all claims allowed under section 507(a) of the Bankruptcy Code, but junior to the Superpriority claim of the DIP Lender, to the extent of the failure to preserve such value.

(f)      <u>Reporting Requirements to Mayrich</u>. For as long as Mayrich's cash collateral is permitted to be used pursuant to this Agreement, both Debtors will furnish to Mayrich the same information at the same time as will be furnished to the DIP Lender in <u>Section 10(b)</u>

Section 6.      <u>UCC Filings</u>.  The DIP Lender is authorized by the Debtors to file UCC financing statements with respect to all DIP Collateral of the Debtors in all jurisdictions as may be necessary or, in the opinion of the DIP Lender, desirable to perfect the security interest created in such DIP Collateral pursuant to the DIP Collateral Documents and this Agreement and Debtors will cooperate with all such filings.

Section 7.      <u>Other DIP Loan Terms</u>.

(a)      <u>Repayment</u>.  The DIP loan will be due and payable, and on the Maturity Date, the Debtors will repay all of the DIP Obligations, including all accrued and unpaid principal, interest fees, costs, expenses and all obligations under this Agreement and the DIP Credit Documents.

(b)      <u>Application of Payments and Proceeds</u>.

(i)      Any amount required to be paid pursuant to this Agreement and all proceeds of the DIP Collateral, whether before or after an Event of Default, will be applied:

(1)      first, to repay any fees, costs, or expenses payable to the DIP Lender;

(2)      second, to repay any principal amount outstanding in respect of the DIP Loan; and

(3)      third, to pay accrued and unpaid interest, in any other fees, costs, expenses, and other outstanding DIP Obligations.

(ii)      Business Day.  Whenever any payment to be made under this Agreement is due on a day that is not a Business Day, such payment will be made on the immediately following Business Day.

Section 8.      Conditions Precedent.

(a)      Conditions Precedent; Closing Date.  The obligation of the DIP Lender to make the Initial Draw and each Additional Draw, is subject to satisfaction, or waiver, of the following conditions by the date of each such draw (such satisfaction or waiver demonstrated by the funding of a DIP Loan):

(i)      DIP Interim Order and DIP Final Order.  The DIP Interim Order and the DIP Final Order, as applicable, and all motions relating thereto, approving, and authorizing the DIP Loan, all provisions thereof and the priorities and DIP Liens granted under Bankruptcy Code sections 364(c) and (d), as applicable, will be in form and substance satisfactory to the DIP Lender and Mayrich, and the DIP Final Order will be entered no later than July 15, 2020, in a form and substance acceptable to the DIP Lender and Mayrich in its sole discretion and will include, among others, the following provisions:

(1)      modifying the automatic stay to permit the creation and perfection of the DIP Liens;

(2)      granting Mayrich Replacement Liens and such other Adequate Protection that the Debtors and the DIP Lender may permit;

(3)      granting Cap West Adequate Protection Liens and such other Adequate Protection that the Debtors and the DIP Lender may permit;

(4)      granting the Liens provided for herein;

(5)      prohibiting any granting or imposing of Liens other than DIP Liens and any other liens that the DIP Lender may permit in its sole discretion; and

(6)      authorizing and approving the Debtors to sign and deliver the DIP Credit Documents to which each will be a party and the transactions contemplated therein, including the granting of the Superpriority status, the first-priority, and DIP Liens upon the DIP Collateral, and the payment of all fees and expenses due to the DIP Lender.

13

(7)     Prohibiting any party in interest from challenging the validity, priority or extent of Mayrich's security interest in the Mayrich Collateral, unless such challenge is made, after any necessary Bankruptcy Court authorization for such challenge is granted, not later than 60 days following the entry of a final DIP order, if a Committee is appointed, and 75 days following the entry of a final DIP order, if no Committee is appointed, which deadlines may be extended by the Court for cause shown if an application for such extension is made prior to the expiration of such deadline; and

(8)     Prohibiting any person from using cash collateral to litigate with Mayrich with respect to the validity, priority and extent of Mayrich's interest in the Mayrich Collateral.

(ii)     As of the Final Order Entry Date, the DIP Final Order will further state, among other things, that, upon entry of the DIP Final Order:

(1)     the DIP Lender and its counsel, advisors, consultants, will each be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code;

(2)     Mayrich and its counsel, advisors, consultants, will each be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code;

(3)     permit the DIP Lender the right to credit bid, subject to section 363(k) of the Bankruptcy Code or applicable law, the DIP Loan, in whole or in part, in connection with any plan, sale, or other disposition of assets in the Cases; and

(4)     permit Mayrich the right to credit bid, subject to section 363(k) of the Bankruptcy Code or applicable law, the DIP Loan, in whole or in part, in connection with any plan, sale, or other disposition of assets in the Cases.

(iii)     <u>Compliance with Financing Orders</u>.

(1)     No Financing Order will have been reversed, modified, amended, stayed, or vacated, in the case of any modification or amendment, manner, or related to a matter, without the prior written consent of the DIP Lender and Mayrich.

(2)     The Debtors will be in compliance in all respects with the Financing Orders.

(iv)     <u>Debtor-in-Possession</u>.   No trustee or examiner will have been appointed with respect to the Debtors or their properties.

(v)     <u>DIP Budget and Projections</u>.   The DIP Lender will have received:

(1)     the DIP Budget;

14

(2)      all information then required to be delivered to the DIP Lender pursuant to <u>Section 10(b)</u>; and

(3)      such other information (financial or otherwise) as may be reasonably requested by the DIP Lender.

(vi)      <u>Performance of Obligations</u>.   The Debtors will have complied in all material respect with all of their other obligations to the DIP Lender as set forth in this Agreement and the other DIP Credit Documents.

(vii)      <u>Insurance/Assets</u>.   The DIP Lender will be named as a loss payee (in respect of property/casualty insurance policies maintained by the Debtors) an additional insured (in respect of liability insurance policies maintained by the Debtors), and that the DIP Lender will be provided with 30 days' advance notice of non-renewal, cancellation, or amendment riders in respect of such policies.

(viii)      <u>No Default</u>.   No Event of Default will exist at the time of, or after giving effect to, the transactions contemplated on the Closing Date, including the advancing of the DIP Loan.

(ix)      <u>Representations and Warranties</u>.   All representations and warranties in the DIP Credit Documents and this Agreement will be true and correct in all material respects as of the date of such draw.

(x)      <u>DIP Credit Documents</u>.   The DIP Lender and Mayrich will have received the signed original copies of each DIP Credit Document.

(xi)      <u>Certain Expenses</u>.   The Interim DIP Order and the DIP Budget will provide for the Debtors to pay, on the terms and schedule provided therein, all fees and reasonable out-of-pocket expenses of the DIP Lender incurred in connection with this Agreement and the other DIP Credit Documents, including the reasonable fees (including the Commitment Fee), costs and expenses of its counsel (the "<u>Formation Expenses</u>"); the DIP Lender will submit the Formation Expenses, on one or more occasions, to the Debtors. The Debtors will promptly pay such expenses, but in no event, such payment will be made by the Debtors to the DIP Lender on or before seven (7) Business Days after such expenses are submitted to the Debtors by the DIP Lender. If the Debtors fail to pay the Formation Expenses when due, the amount of the Formation Expenses will be added to the principal outstanding under the DIP Loan as of the due date and will not be deemed an Event of Default.

(b)      <u>Conditions to Advance under the DIP Loan</u>.   The obligations of the DIP Lender to make advances under the DIP Loan, and Mayrich's consent to the Debtors' use of Cash Collateral, is subject to the satisfaction or waiver, of the following conditions precedent:

(i)      <u>No Default or Event of Default</u>.   As of such DIP Draw Request Date, no event will have occurred and be continuing or would result from the consummation of the applicable DIP Loan (or the application of its proceeds) that would constitute an Event of Default.

(ii)    Available Commitments.  After making the DIP Loan requested on such DIP Draw Request Date, the aggregate outstanding principal amount of the DIP Loan will not exceed the Maximum Commitment.

(iii)    Secured Loan of Pac West.    The Secured Claim of Pac West shall not have been allowed in an amount exceeding $448,500.

(iv)    Material Adverse Effect.    Since the Petition Date, no event will have occurred which, in the sole opinion of the DIP Lender, has a material adverse effect on the Debtors' business or its prospects for a sale or reorganization.

(v)    No Plan of Liquidation or Conversion to Chapter 7. Either or both Debtors shall not have filed a liquidating plan or converted their respective case to chapter 7.

(vi)    Use of Proceeds.   The Debtors will have confirmed in writing that the proceeds of such DIP Loan used only in accordance with the provisions of Section 2(b) and the other provisions of this Agreement and DIP Budget.

(vii)    No Material Adverse Effect.  Since the Petition Date, no material adverse effect will have occurred after giving effect to the making of the DIP Loan in the reasonable opinion of the DIP Lender and Mayrich.

(viii)    Confirmation.  Upon the request of the DIP Lender and/or Mayrich, the Debtors will provide a certificate signed by an authorized officer, in a form acceptable to the DIP Lender and/or Mayrich, that the conditions set forth in this Section have been satisfied.

Section 9.    Representations and Warranties.   In order to induce the DIP Lender to enter into this Agreement and to make each DIP Loan, and to induce Mayrich to consent to the Debtors' use of Cash Collateral, both Debtors hereby represent and warrant to the DIP Lender and Mayrich, on the Closing Date and on each DIP Draw Request Date as follows, any of which may be waived in writing by the DIP Lender:

(a)    Status; Authorization.

(i)    Both Debtors are duly organized, validly existing, in good standing under the laws of its jurisdiction of organization and are duly qualified and in good standing in every jurisdiction where they are doing business except where the failure to do so could not reasonably be expected to have a material adverse effect and, subject to the entry by the Bankruptcy Court by the Financing Orders, the signing delivery and performance by both Debtors of the DIP Credit Documents:

(1)      are within its respective authority;

(2)      have been duly authorized; and

(3)      do not conflict with or contravene its constitutive documents.

(b)    <u>Signing and Binding Effect</u>.  Subject to the entry by the Bankruptcy Court of any Financing Order, upon the signing delivery thereof, each DIP Credit Document will constitute the legal, valid, and binding joint and several obligations of both of the Debtors, enforceable in accordance with its terms.

(c)    <u>Insurance</u>.    The policies, binders, or self-insurance programs fire liability, product liability, workmen's compensation, vehicular and other insurance currently held by or on behalf of the Debtors insure its material properties and business activities against such losses and risk as are adequate to protect its properties in accordance with customary industry practice when entered into or renewed.

(d)    <u>Absent of Evidence of Default</u>.  Since the Petition Date, no event has occurred and is continuing and no condition exists which constitutes an Event of Default under the DIP Loan which has not been waived by the DIP Lender.

(e)    <u>Compliance with Law</u>. The Debtors have complied and are in compliance in all respects with all laws, except for such instances of noncompliance that, individually or in the aggregate, could not reasonably be expected to have a material adverse effect.

(f)    <u>No Defense</u>.  Each Debtor hereby acknowledges that it has no defense, counterclaim, offset, cross-complainant, claim, or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of its liability to repay the DIP Obligations.

Section 10.    <u>Affirmative Covenants</u>.

(a)    Until payment in full of all DIP Obligations, both Debtors will perform all the covenants in this Agreement, including this <u>Section 10</u> and <u>Section 11</u>, and the other DIP Credit Documents applicable to it.

(b)    <u>Reporting Requirements</u>.  Unless such requirements are waived by the DIP Lender, the Debtors will furnish to the DIP Lender:

(i)    Within one week from the last day of each Budget Period, a report setting forth, in a form in sufficient detail satisfactory to the DIP Lender, a comparison of actual receipts and expenses to budgeted receipts and expenses for said Budget Period, indicating any Permitted Variances.

(ii)    A copy of each Monthly Operating Report on the day it is filed.

(iii)     Within five (5) Business Days after either Debtor obtains knowledge thereof, a written statement of the Debtors setting forth details of:

(1)     any litigation or governmental proceeding filed or threatened in writing against either or both Debtors other than any claim or litigation filed in the Bankruptcy Court; and

(2)     any other event, act or condition that has or could reasonably be expected to have a material adverse effect on the overall business of the Debtors or their prospects for reorganization.

(iv)     As promptly as reasonably practicable on one or more occasions following the DIP Lender's request therefor, such other information regarding the operations, business affairs and financial conditions of the Debtors as the DIP Lender may reasonably request.

(c)     <u>DIP Budget</u>.  On that date which is sixty (60) days from the Initial Draw, and on each date which is sixty (60) days thereafter (each a "New Budget Date"), the Debtors will deliver a written ninety (90) day budget commencing as of the New Budget Date to the DIP Lender and to counsel to the Committee (if any). If neither the DIP Lender nor the Committee objects to the proposed budget, orally or in writing, within five (5) days of delivery, the budget will be deemed accepted and become the DIP Budget for all purposes under this Agreement. If either the DIP Lender or the Committee objects, the Debtors, the DIP Lender, the committee and their advisors will work together to attempt to resolve all concerns and come to an approved budget which will be deemed the DIP Budget for all purposes under this Agreement. If the parties cannot reach agreement, the DIP Lender will deliver a written ninety (90) day budget to the Debtors and the Committee no later than the twenty-eighth (28th) day after its receipt of the proposed budget, and such budget will be deemed the DIP Budget for all purposes under this Agreement.

(d)     <u>Insurance</u>.

(i)     Both Debtors will maintain, at its respective expense, and keep in effect with responsible insurance companies, such liability insurance for bodily injury and third-party property damage as is customary in the case of companies engaged in the same or similar business or having similar properties, similarly situated.

(ii)     Both Debtors will keep and maintain, at its expense, its material real and personal property insured against loss or damage by fire, theft, explosion, spoilage and other risks ordinarily insured against by owners or users of such properties in similar businesses in an amount equal to the full replacement or cash value thereof, subject to deductible amounts which the Debtors, in their reasonable judgment, deems prudent.

(e)     <u>Existence; Conduct of Business</u>.  Both Debtors will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits (including, environmental permits), privileges, franchise, patent,

18

trademarks and tradenames material to the conduct of its business, except to the extent that failure to do so, either individually or in the aggregate, could not reasonably be expected to have a material adverse effect.

(f)      Compliance with Laws.  Except as otherwise excused by the Bankruptcy Code, the Debtors will comply with all laws, rules, licenses, permits, regulations, and orders of any Governmental Body applicable to it or its property, except where failure to do so, in the aggregate, could not reasonably be expected to result in a material adverse effect.

Section 11.      Negative Covenants/Financial Covenants.

(a)      Both Debtors will, until all of the DIP Obligations have been paid in full, perform all covenants in this Agreement including this Section 11.

(b)      Indebtedness.  Both Debtors will not, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guaranty, assume, endorse, or otherwise become responsible for (directly or indirectly), any Indebtedness, performance, obligations or dividends of any Person without the prior written approval of the DIP Lender, except:

(i)      the obligations under this Agreement including the DIP Obligation, DIP Obligations, the Replacement Lien and the Adequate Assurance Lien;

(ii)      purchase money Indebtedness (including Capital Leases) to the extent secured by purchase money security interest in Equipment (including Capital Leases), so long as such security interest do not apply to any property of the Debtors other than the Equipment so acquired, and the Indebtedness secured thereby does not exceed the cost of the Equipment so acquired, as the case may be;

(iii)      unsecured trade debt of either Debtor incurred in the ordinary course of business after the Petition Date.

Section 12.      Events of Default.  Any one or more of the following events which occur and which are continuing will constitute an "Event of Default":

(a)      Failure to Make Payments When Due.  Failure by the Debtors to pay any of the DIP Obligations when due.

(b)      Breach of Certain Covenants.  Failure of either Debtor to perform or comply with any material term or material condition contained in Section 10 and Section 11, and such failure is continuing for five (5) Business Days after the date the DIP Lender notifies Debtors in writing of such failure.

(c)      Breach of Representations, Etc.  Any material Representation, warranty, certification, or other statement made or deemed made by either Debtor in any DIP Credit Document, or in any statement or certificate at any time given by either Debtor in writing to the

19

DIP Lender, pursuant to this Agreement will be false in any material respect as of the date made or deemed made.

(d)    <u>Other Defaults Under DIP Credit Documents</u>.  Either Debtor fails in the material performance of, or material compliance with, any term contained in this Agreement and the other DIP Credit Documents, other than any such term referred to in any other section of this <u>Section 12</u>, and such failure will not have been remedied or waived within five (5) Business Days after the DIP Lender notifies Debtors in writing of such failure.

(e)    <u>Change of Control</u>.  A change of control occurs without the prior written approval of the DIP Lender.

(f)    <u>DIP Collateral Documents and other DIP Credit Documents</u>.   At any time after the signing and delivery thereof, of this Agreement or any DIP Credit Documents cease to be in full force and effect (other than by reason of release of DIP Collateral in accordance with the terms of this Agreement or thereof or satisfaction in full of the DIP Obligations in accordance with the terms of this Agreement) or will be declared null and void, or the DIP Lender will not have or will cease to have a valid and perfected DIP Lien in any material portion of the DIP collateral.

(g)    <u>Other Events of Default</u>.

(i)    Either Debtor files a plan of reorganization or liquidation, or enters into any transaction for the sale of all or substantially all of either or both of the Debtors' assets that does not provide for payment in full in cash of the DIP Obligations, unless approved in writing by the DIP Lender.

(ii)    A trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of either Debtor (powers beyond those set forth in Sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), is appointed in these Cases.

(iii)    Any other Lien is granted with respect to any of the DIP Collateral without the prior written consent of the DIP Lender unless at the time such Lien is granted all DIP Obligations are indefeasibly paid in full in cash.

(iv)    The Bankruptcy Court enters an order granting relief from the automatic stay to any creditor or party in interest:

(1)    to permit the enforcement of any Lien on any material asset of either Debtor; or

(2)    to permit other actions that the DIP Lender may, in its reasonable discretion, deem to have a material adverse effect on the business of the Debtors.

(v)    Any material provision of the DIP Credit Documents ceases to be valid or binding on either Debtor, or either Debtor so assert, in any pleading filed in any court.

20

(vi)     Any Order is entered reversing, amending, supplementing, staying, vacating, or otherwise modifying in any material respect a DIP Interim Order or the DIP Final Order without the prior written consent of the DIP Lender.

(vii)    The exclusive period for either or both Debtors to file a plan of reorganization under Section 1121(b) of the Bankruptcy Code expires or is terminated.

(viii)   The DIP Final Order is not entered by the Bankruptcy Court by July 15, 2020.

(ix)     The Secured Claim of Pac West is allowed by final order in an amount exceeding $448,500.

(x)      Either Case is dismissed or converted to a chapter 7 proceeding.

(xi)     Either or both Debtors file a liquidating plan.

(xii)    Any subsidiary or either or both Debtors is sold or liquidated without the prior written approval of the DIP Lender.

Section 13.     Remedies.

(a)     Upon and after the occurrence of an Event of Default, the DIP Lender may take any and all of the following actions, at the same or different times, in each case without further order of, or application to, the Bankruptcy Court (provided, that with respect to the enforcement of the Liens or other remedies with respect to the DIP Collateral the DIP Lender will provide the Borrowers (with a copy to the United States Trustee and counsel to any official committee that may be appointed in the Cases) with five (5) Business Days' written notice prior to taking the action contemplated thereby; in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, and Event of Default has occurred and is continuing):

(i)      declare the DIP Commitment terminated, whereupon such DIP Commitment will terminate immediately; and

(ii)     declare immediately due and owing all outstanding principal and any accrued interest in respect of the DIP Loan owing with respect thereto under this Agreement, and all unpaid fees and expenses whereupon the same will become, forthwith immediately due and payable without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by both Debtors.

(b)     In addition, upon the occurrence of an Event of Default, the DIP Lender may:

(i)        bring a motion to lift the stay and enforce any rights it may have under the DIP Credit Documents or at law or in equity on two (2) business strike that Business Days' notice.

(ii)        bring any lawsuit, action or other proceeding, permitted by law for the specific performance of, or injunction against any violation of, any DIP Credit Documents and may exercise any power granted under or to recover judgment under any DIP Credit Documents; provided, this stay has been lifted; and

(iii)        exercise any other right or remedy permitted by applicable law, or otherwise available to the DIP Lender at law, in equity, or otherwise.

(c)        No remedy in this Agreement conferred upon the DIP Lender is intended to be exclusive of any other remedy, and each and every remedy will be cumulative and will be in addition to every other remedy given under this Agreement, now or hereinafter existing at law or in equity or by statute or any other provision of law. The DIP Lender's failure to exercise any remedy at any time will not be deemed a waiver of either the remedy or the extent of Default. An Event of Default can only be waived by the DIP Lender in writing.

(d)        Anything contained in any of the DIP Credit Documents to the contrary notwithstanding, the Debtors and the DIP Lender hereby acknowledge that in the event of any sale by the DIP Lender or Debtors pursuant to a public or private sale, the DIP Lender may be the purchaser of any and all such DIP Collateral and any such sale will be entitled for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the DIP Collateral sold at such public sale or any sale under section 363 of the Bankruptcy Code or any reorganization, to use and apply any of the DIP Obligations as a credit on account of the purchase price for any DIP Collateral payable by the DIP Lender at such sale.

Section 14.    Miscellaneous.

(a)        Amendments and Waivers; Release of DIP Collateral.  No amendment, modification, termination (other than pursuant to the express terms of the DIP Credit Documents), or waiver of any provision of the DIP Credit Documents, or consent to any departure by either Debtor therefrom, will be effective without the written consent of the DIP Lender.

(b)        Amendments and Waivers; Release of the Replacement Lien Collateral. No amendment, modification, termination of Mayrich's Replacement Lien or consent to any departure by either Debtor therefrom, will be effective without the written consent of the Mayrich.

(c)        Amendments and Waivers; Release of the Adequate Assurance Lien. Collateral.  No amendment, modification, termination of Cap West's Adequate Protection Lien or consent to any departure by either Debtor therefrom, will be effective without the written consent of the Cap West.

22

(d)    <u>Effect of Notices, Waivers, or Consents</u>.

(i)    Any waiver or consent will be effective only in the specific instance and for the specific purpose for which it was given.

`(ii)    No notice to or demand on either Debtor will entitle either Debtor to any other or further notice (except as otherwise specifically required under this Agreement or under any of the DIP Credit Documents) or demand in similar or other circumstances.

(iii)    Any amendment, modification, termination, waiver, or consent affected in accordance with this Section 14(d)(iii) will be binding upon the DIP Lender.

(e)    <u>Notices</u>.

(i)    All notices, requests, demands, and other communications to any party or given under any DIP Credit Documents (collectively, the "<u>Notices</u>") will be in writing and delivered personally, by nationally recognized overnight courier (<u>e.g.</u>, Federal Express) or by USPS First Class mail, Certified Mail Return Receipt Requested, to the parties at the following address:

|  |  |
|---|---|
| If to the Debtors. | RM Bakery LLC<br>220 Coster Street<br>Bronx, NY 10474<br>Attention: Mark Rimer<br><br>with a copy to<br>(which will not constitute notice):<br><br>Mayerson & Hartheimer, PLLC<br>845 3rd Avenue<br>11th Floor<br>New York, NY 10022<br>Attention:  David H. Hartheimer, Esq. |
| If to the DIP Lender | FS Lender 2015 LLC<br>220 East 42nd Street<br>29th Floor<br>New York, NY 10017 |
| If to Mayrich | Becker, Glynn, Muffly, Chassin & Hosomski LLP<br>299 Park Avenue<br>New York, NY 10171<br>Attention: Alec P. Ostrow |

(ii)    All Notices will be deemed delivered when actually received. Each of the Parties will hereafter notify the other in accordance with this <u>Section 14(e)</u> of any change of address to which notices required to be delivered.

(f)    <u>Integration</u>.    This Agreement, the Financing Orders, and the other DIP Credit Documents contain and constitute the entire agreement of the Parties with respect to the subject matter of this Agreement and supersede all prior negotiations, agreements, and understandings whether written or oral, of the parties to this Agreement. Certain of the provisions of the DIP Credit Documents may be modified by the Financing Order, in the event of any inconsistency between any of the DIP Credit Documents and the Financing Orders, the provisions of the Financing Order will govern.

(g)    <u>No Waiver</u>.    No course of dealing and no failure or delay on the part of any Party to this Agreement in exercising any right, power, or remedy conferred by this Agreement will operate as a waiver thereof or otherwise prejudice such Party's right, powers, and remedies conferred by this Agreement, or will preclude any other or further exercise thereof or the exercise of any right, power or remedy.  A single or partial exercise of any right, power, or privilege will not preclude any other further exercise of the right, power or privilege or the exercise of any other right, power or privilege. The rights and remedies provided in the DIP Credit Documents will be cumulative and will not be exclusive of any rights or remedies provided by law.

(h)    <u>Counterparts; Electronic Signature</u>.  This Agreement may be signed:

(i)    in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same Agreement and binding on all of the Parties to this Agreement, notwithstanding that all of the parties are not signatory to the original or the same counterpart; and

(ii)    via facsimile transmission or other electronic transmission which provides an accurate copy of this Agreement, with such copy will be deemed an original.

Section 16.    <u>Governing Law; Submission to Exclusive Jurisdiction; Venue; Waiver of Jury Trial</u>.

(a)    Subject to the jurisdiction of the Bankruptcy Court, this Agreement and the other DIP Credit Documents, and the rights and obligations of the Parties under this Agreement and thereunder will be construed in accordance with, and be governed by the Bankruptcy Code and, where applicable, the internal law of the State of New York, without regard to conflict of laws, rules and principles thereunder.

(b)    Any legal action or proceeding with respect to this Agreement or any other DIP Credit Documents will be brought exclusively in the Bankruptcy Court, and, by signing and delivery of this Agreement or any other DIP Credit Document, each Party thereto, submits to the jurisdiction of the Bankruptcy Court in the Southern District of New York.

.

       (c)    <u>JURY WAIVER</u>.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT.

       (d)    <u>Severability</u>.

       (i)    If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transaction contemplated by the Agreement is not affected in any manner adverse to any party.

       (ii)    Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties to this Agreement will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transaction contemplated by this Agreement and other DIP Credit Documents are fulfilled to the extent possible.

       (e)    <u>Survival</u>.  All representations, warranties, covenants, agreements, and conditions contained in or made pursuant to this Agreement and the other DIP Credit Documents will survive:

       (i)    the making of the DIP Loan and the payment of the DIP Obligation; and

       (ii)    the performance, observation, and compliance with the covenants, terms and conditions, expressed or implied, of all DIP Credit Documents, until the due and punctual:

       (1)    indefeasible payment of the DIP Obligation; and

       (2)    performance, observance, and compliance with the covenants, terms, and conditions expressed or implied, of this Agreement and all other DIP Credit Documents.

       (f)    <u>Modifications</u>.

       (i)    Except as specifically contemplated in the Financing Orders, the Liens, lien priority, administrative priorities, and all other rights, and remedies granted to the DIP Lender pursuant to this Agreement and the Financing Orders (specifically, including the existence, perfection and priority of the Liens provided in this Agreement and therein and the administrative priority in this Agreement and therein) will not be modified, altered, or impaired in any manner by any other financing extension of credit or incurrence of Indebtedness by either

Debtor (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Cases, or by any other act or admission whatsoever (other than in connection with any asset disposition permitted under this Agreement). Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act, or omission, the Liens and security interest granted under this Agreement and the other DIP Credit Documents will continue to be valid and perfected and with the specific priority stated herein without the necessity that financing statements be filed or that any other action be taken, or document or instrument registered or delivered, under applicable non-bankruptcy law.

(ii)    Notwithstanding any failure on the part of either Debtor or the DIP Lender to perfect, maintain, protect, or enforce the DIP Liens and security interest in the DIP Collateral granted under the DIP Collateral Documents, the Financing Orders will automatically, and without further action by any Person, perfect such DIP Liens and security interest against the DIP Collateral of the Debtors.

(g)    <u>Lead Debtor</u>. BKD is Authorized to act for, and on behalf of RM Bakery. Any act, direction, notice, waiver, or other consent provided by the Debtors or an authorized officer of the Debtors will be deemed, and will be, the act, direction, notice, waiver, or other consent of each Debtor.

(h)    <u>Strict Construction</u>. The language used in this Agreement will be deemed the language chosen by the Parties to express their collective intent; no rule of strict construction will be applied to any Party.

(i)    <u>Interpretation</u>.

(i)    The headings contained in this Agreement are for convenience of reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.

(ii)    Whenever the words "include," "includes," or "including" are used in this Agreement, they will be deemed to be follow by the words "without limitation" (whether or not such words or similar words are used).

(iii)    The meaning given to terms defined in this Agreement will be equally applicable to both the singular and the plural forms of such terms.

(iv)    Unless otherwise indicated to the contrary in this Agreement by the context or use in this Agreement, the words, "in this Agreement," "hereto," "of this Agreement" and words of similar import refer to this Agreement as a whole and not to any particular Section or paragraph of this Agreement.

(v)    Words importing the masculine gender will also include the feminine and neutral genders, and vice versa.

26

(vi)     Any terms used in this Agreement which are defined in the UCC will be construed and defined as set forth in the UCC, unless otherwise defined in this Agreement.

(vii)    The words "will" and "shall" have the same meaning and effect.

(viii)   The word "or" is not exclusive and is deemed to have the meaning "and/or".

(ix)     The word "any" is not limiting and means "any and all" unless the context clearly requires or the language provides otherwise.

(x)      Unless the context otherwise requires, any reference in this Agreement to any Person will be construed to include such Person's successors, assigns, as a debtor, as a debtor-in-possession, and any receiver or trustee for such Person.

(xi)     The Exhibits referred to in this Agreement will be construed with, as an integral part of, this Agreement to the same extent as if they were set forth verbatim in this Agreement.

**IN WITNESS WHEREOF**, the parties to this Agreement have signed this Agreement as of the Agreement Date.

**RM Bakery LLC (on behalf of itself and BKD Group LLC)**

By: _____
   Name:  Mark Rimer
   Title:  Authorized Signatory


**FS Lender 2015 LLC**

By: _____
    Name:
    Title:


**Mayrich Capital LLC**

By: _____
    Name:
    Title:

(vi)     Any terms used in this Agreement which are defined in the UCC will be construed and defined as set forth in the UCC, unless otherwise defined in this Agreement.

(vii)    The words "will" and "shall" have the same meaning and effect.

(viii)   The word "or" is not exclusive and is deemed to have the meaning "and/or".

(ix)     The word "any" is not limiting and means "any and all" unless the context clearly requires or the language provides otherwise.

(x)      Unless the context otherwise requires, any reference in this Agreement to any Person will be construed to include such Person's successors, assigns, as a debtor, as a debtor-in-possession, and any receiver or trustee for such Person.

(xi)     The Exhibits referred to in this Agreement will be construed with, as an integral part of, this Agreement to the same extent as if they were set forth verbatim in this Agreement.

**IN WITNESS WHEREOF**, the parties to this Agreement have signed this Agreement as of the Agreement Date.

**RM Bakery LLC (on behalf of itself and BKD Group LLC)**

By:_____
   Name:  Mark Rimer
   Title:


**FS Lender 2015 LLC**

By: _____
     Name:
     Title:


**Mayrich Capital LLC**

By:_____
     Name:
     Title:

27

# EXHIBIT A

**RM BAKERY LLC**
**13-WEEK CASH FLOW FORECAST - RESTRUCTURING**

| | Forecast [1] | | | | | | | | | | | | | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | |
| Week Commencing | 6/14/20 | 6/21/20 | 6/28/20 | 7/5/20 | 7/12/20 | 7/19/20 | 7/26/20 | 8/2/20 | 8/9/20 | 8/16/20 | 8/23/20 | 8/30/20 | 9/6/20 | |
| Beginning Cash | $ 30,000 | $ 10,858 | $ 96,154 | $ 73,248 | $ 14,091 | $ 7,099 | $ 5,662 | $ 79,394 | $ 45,790 | $ 47,946 | $ 27,517 | $ 14,201 | $ 77,058 | $ 30,000 |
| Operating Cash Receipts | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 1,755,000 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| **Payroll:** | | | | | | | | | | | | | | |
| Payroll (including Employer Taxes) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (853,677) |
| Workers Compensation | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (52,000) |
| Consulting and other expenses | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (47,288) |
| Healthcare | $ - | $ (5,000) | $ - | $ - | $ - | $ (5,000) | $ - | $ - | $ - | $ (5,000) | $ - | $ - | $ - | $ (15,000) |
| **Total Payroll** | $ (73,305) | $ (78,305) | $ (73,305) | $ (73,305) | $ (73,305) | $ (78,305) | $ (73,305) | $ (73,305) | $ (73,305) | $ (78,305) | $ (73,305) | $ (73,305) | $ (73,305) | $ (967,965) |
| **COGS Expenses:** | | | | | | | | | | | | | | |
| Ingredients & Raw Materials | $ (37,047) | $ (35,147) | $ (36,784) | $ (36,383) | $ (36,104) | $ (36,424) | $ (36,304) | $ (36,277) | $ (36,335) | $ (36,305) | $ (36,306) | $ (36,315) | $ (36,309) | $ (472,039) |
| Packaging | $ (9,454) | $ - | $ - | $ (9,454) | $ - | $ - | $ (9,454) | $ - | $ - | $ (9,454) | $ - | $ - | $ (9,454) | $ (47,269) |
| Outsourced Distribution Expenses | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (109,200) |
| **Total COGS Expenses** | $ (54,901) | $ (43,547) | $ (45,184) | $ (54,236) | $ (44,504) | $ (44,824) | $ (54,157) | $ (44,677) | $ (44,735) | $ (54,159) | $ (44,706) | $ (44,715) | $ (54,163) | $ (628,508) |
| **Occupancy Expenses:** | | | | | | | | | | | | | | |
| Rent | $ (5,000) | $ - | $ (5,000) | $ (30,318) | $ - | $ - | $ - | $ (30,318) | $ - | $ - | $ - | $ (30,318) | $ - | $ (100,955) |
| RE Taxes | $ - | $ - | $ - | $ (16,000) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (16,000) |
| Utilities | $ - | $ - | $ (12,000) | $ - | $ - | $ - | $ (12,000) | $ - | $ - | $ - | $ (12,000) | $ - | $ - | $ (36,000) |
| Warehouse Expenses | $ (777) | $ (2,351) | $ (818) | $ (797) | $ (2,024) | $ (808) | $ (806) | $ (803) | $ (2,305) | $ (806) | $ (805) | $ (805) | $ (805) | $ (14,710) |
| **Total Occupancy Expenses** | $ (5,777) | $ (2,351) | $ (17,818) | $ (47,115) | $ (2,024) | $ (808) | $ (12,806) | $ (31,121) | $ (2,305) | $ (806) | $ (12,805) | $ (31,123) | $ (805) | $ (167,664) |
| **Other Operating Expenses:** | | | | | | | | | | | | | | |
| Insurance | $ - | $ - | $ (3,500) | $ (2,000) | $ - | $ - | $ (3,500) | $ (2,000) | $ - | $ - | $ - | $ (5,500) | $ - | $ (16,500) |
| Capital Leases | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (39,000) |
| Miscellaneous | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (32,500) |
| **Total Other Operating Expenses** | $ (5,500) | $ (5,500) | $ (9,000) | $ (7,500) | $ (5,500) | $ (5,500) | $ (9,000) | $ (7,500) | $ (5,500) | $ (5,500) | $ (5,500) | $ (11,000) | $ (5,500) | $ (88,000) |
| **Net Operating Cash Flow** | $ (4,483) | $ 5,297 | $ (10,306) | $ (47,157) | $ 9,667 | $ 5,563 | $ (14,269) | $ (21,604) | $ 9,155 | $ (3,770) | $ (1,316) | $ (25,143) | $ 1,227 | $ (97,137) |
| **Restructuring Cost:** | | | | | | | | | | | | | | |
| IRS/NYS - Q4 & Q1 taxes | $ - | $ - | $ - | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (20,000) |
| Workers Comp Audit | $ (9,659) | $ - | $ - | $ - | $ (9,659) | $ - | $ - | $ - | $ - | $ (9,659) | $ - | $ - | $ - | $ (28,977) |
| Legal & Professional Fees | $ (5,000) | $ (5,000) | $ (12,600) | $ (10,000) | $ (5,000) | $ (5,000) | $ (10,000) | $ (10,000) | $ (5,000) | $ (5,000) | $ (10,000) | $ (10,000) | $ (5,000) | $ (97,600) |
| Utility Deposits | $ - | $ (15,000) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (15,000) |
| **Total Restructuring Cost** | $ (14,659) | $ (20,000) | $ (12,600) | $ (12,000) | $ (16,659) | $ (7,000) | $ (12,000) | $ (12,000) | $ (7,000) | $ (16,659) | $ (12,000) | $ (12,000) | $ (7,000) | $ (161,577) |
| **Net Cash Flow Before Financing** | $ (19,142) | $ (14,703) | $ (22,906) | $ (59,157) | $ (6,992) | $ (1,437) | $ (26,269) | $ (33,604) | $ 2,155 | $ (20,429) | $ (13,316) | $ (37,143) | $ (5,773) | $ (258,714) |
| **DIP Financing:** | | | | | | | | | | | | | | |
| Borrowing / (Repayment) | $ - | $ 100,000 | $ - | $ - | $ - | $ - | $ 100,000 | $ - | $ - | $ - | $ - | $ 100,000 | $ - | $ 300,000 |
| Interest / Fees | | | | | | | | | | | | | | |
| **Net DIP Financing** | $ - | $ 100,000 | $ - | $ - | $ - | $ - | $ 100,000 | $ - | $ - | $ - | $ - | $ 100,000 | $ - | $ 300,000 |
| **Net Cash Flow** | $ (19,142) | $ 85,297 | $ (22,906) | $ (59,157) | $ (6,992) | $ (1,437) | $ 73,731 | $ (33,604) | $ 2,155 | $ (20,429) | $ (13,316) | $ 62,857 | $ (5,773) | $ 41,286 |
| **Ending Cash** | $ 10,858 | $ 96,154 | $ 73,248 | $ 14,091 | $ 7,099 | $ 5,662 | $ 79,394 | $ 45,790 | $ 47,946 | $ 27,517 | $ 14,201 | $ 77,058 | $ 71,286 | $ 71,286 |

**Notes:**
(1) assumes filing date of Jun 15, 2020
(2) consolidates cash flows of subsidiary entities
(3) does not include optional, discretionary capex of up to $100k during this period
(4) assumes interest and fees on DIP accrued - may be paid in cash

# EXHIBIT B

**SCHEDULE I**

| Date | Drawdown Amount | Accrued Interest Added to Principal | Repayment | Principal Balance Due | Available for Drawdown | Borrower Initial | Lender Initial |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

# EXHIBIT B

**RM BAKERY LLC**
**13-WEEK CASH FLOW FORECAST - RESTRUCTURING**

| | Week 1 6/14/20 | Week 2 6/21/20 | Week 3 6/28/20 | Week 4 7/5/20 | Week 5 7/12/20 | Week 6 7/19/20 | Week 7 7/26/20 | Week 8 8/2/20 | Week 9 8/9/20 | Week 10 8/16/20 | Week 11 8/23/20 | Week 12 8/30/20 | Week 13 9/6/20 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Commencing** | | | | | | | | | | | | | | |
| **Beginning Cash** | $ 30,000 | $ 10,858 | $ 96,154 | $ 73,248 | $ 14,091 | $ 7,099 | $ 5,662 | $ 79,394 | $ 45,790 | $ 47,946 | $ 27,517 | $ 14,201 | $ 77,058 | $ 30,000 |
| **Operating Cash Receipts** | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 135,000 | $ 1,755,000 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| **Payroll:** | | | | | | | | | | | | | | |
| Payroll (including Employer Taxes) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (65,667) | $ (853,677) |
| Workers Compensation | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (4,000) | $ (52,000) |
| Consulting and other expenses | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (3,638) | $ (47,288) |
| Healthcare | $ - | $ (5,000) | $ - | $ - | $ - | $ (5,000) | $ - | $ - | $ - | $ (5,000) | $ - | $ - | $ - | $ (15,000) |
| **Total Payroll** | $ (73,305) | $ (78,305) | $ (73,305) | $ (73,305) | $ (73,305) | $ (78,305) | $ (73,305) | $ (73,305) | $ (73,305) | $ (78,305) | $ (73,305) | $ (73,305) | $ (73,305) | $ (967,965) |
| **COGS Expenses:** | | | | | | | | | | | | | | |
| Ingredients & Raw Materials | $ (37,047) | $ (35,147) | $ (36,784) | $ (36,383) | $ (36,104) | $ (36,424) | $ (36,304) | $ (36,277) | $ (36,335) | $ (36,305) | $ (36,306) | $ (36,315) | $ (36,309) | $ (472,039) |
| Packaging | $ (9,454) | $ - | $ - | $ (9,454) | $ - | $ - | $ (9,454) | $ - | $ - | $ (9,454) | $ - | $ - | $ (9,454) | $ (47,269) |
| Outsourced Distribution Expenses | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (8,400) | $ (109,200) |
| **Total COGS Expenses** | $ (54,901) | $ (43,547) | $ (45,184) | $ (54,236) | $ (44,504) | $ (44,824) | $ (54,157) | $ (44,677) | $ (44,735) | $ (54,159) | $ (44,706) | $ (44,715) | $ (54,163) | $ (628,508) |
| **Occupancy Expenses:** | | | | | | | | | | | | | | |
| Rent | $ (5,000) | $ - | $ (5,000) | $ (30,318) | $ - | $ - | $ - | $ (30,318) | $ - | $ - | $ - | $ (30,318) | $ - | $ (100,955) |
| RE Taxes | $ - | $ - | $ - | $ (16,000) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (16,000) |
| Utilities | $ - | $ - | $ (12,000) | $ - | $ - | $ - | $ (12,000) | $ - | $ - | $ - | $ (12,000) | $ - | $ - | $ (36,000) |
| Warehouse Expenses | $ (777) | $ (2,351) | $ (818) | $ (797) | $ (2,024) | $ (808) | $ (806) | $ (803) | $ (2,305) | $ (806) | $ (805) | $ (805) | $ (805) | $ (14,710) |
| **Total Occupancy Expenses** | $ (5,777) | $ (2,351) | $ (17,818) | $ (47,115) | $ (2,024) | $ (808) | $ (12,806) | $ (31,121) | $ (2,305) | $ (806) | $ (12,805) | $ (31,123) | $ (805) | $ (167,664) |
| **Other Operating Expenses** | | | | | | | | | | | | | | |
| Insurance | $ - | $ - | $ (3,500) | $ (2,000) | $ - | $ - | $ (3,500) | $ (2,000) | $ - | $ - | $ - | $ (5,500) | $ - | $ (16,500) |
| Capital Leases | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (3,000) | $ (39,000) |
| Miscellaneous | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (2,500) | $ (32,500) |
| **Total Other Operating Expenses** | $ (5,500) | $ (5,500) | $ (9,000) | $ (7,500) | $ (5,500) | $ (5,500) | $ (9,000) | $ (7,500) | $ (5,500) | $ (5,500) | $ (5,500) | $ (11,000) | $ (5,500) | $ (88,000) |
| **Net Operating Cash Flow** | $ (4,483) | $ 5,297 | $ (10,306) | $ (47,157) | $ 9,667 | $ 5,563 | $ (14,269) | $ (21,604) | $ 9,155 | $ (3,770) | $ (1,316) | $ (25,143) | $ 1,227 | $ (97,137) |
| **Restructuring Cost:** | | | | | | | | | | | | | | |
| IRS/NYS - Q4 & Q1 taxes | $ - | $ - | $ - | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (2,000) | $ (20,000) |
| Workers Comp Audit | $ (9,659) | $ - | $ - | $ - | $ (9,659) | $ - | $ - | $ - | $ - | $ (9,659) | $ - | $ - | $ - | $ (28,977) |
| Legal & Professional Fees | $ (5,000) | $ (5,000) | $ (12,600) | $ (10,000) | $ (5,000) | $ (5,000) | $ (10,000) | $ (10,000) | $ (5,000) | $ (5,000) | $ (10,000) | $ (10,000) | $ (5,000) | $ (97,600) |
| Utility Deposits | $ - | $ (15,000) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (15,000) |
| **Total Restructuring Cost** | $ (14,659) | $ (20,000) | $ (12,600) | $ (12,000) | $ (16,659) | $ (7,000) | $ (12,000) | $ (12,000) | $ (7,000) | $ (16,659) | $ (12,000) | $ (12,000) | $ (7,000) | $ (161,577) |
| **Net Cash Flow Before Financing** | $ (19,142) | $ (14,703) | $ (22,906) | $ (59,157) | $ (6,992) | $ (1,437) | $ (26,269) | $ (33,604) | $ 2,155 | $ (20,429) | $ (13,316) | $ (37,143) | $ (5,773) | $ (258,714) |
| **DIP Financing:** | | | | | | | | | | | | | | |
| Borrowing / (Repayment) | $ - | $ 100,000 | $ - | $ - | $ - | $ - | $ 100,000 | $ - | $ - | $ - | $ - | $ 100,000 | $ - | $ 300,000 |
| Interest / Fees | | | | | | | | | | | | | | |
| **Net DIP Financing** | $ - | $ 100,000 | $ - | $ - | $ - | $ - | $ 100,000 | $ - | $ - | $ - | $ - | $ 100,000 | $ - | $ 300,000 |
| **Net Cash Flow** | $ (19,142) | $ 85,297 | $ (22,906) | $ (59,157) | $ (6,992) | $ (1,437) | $ 73,731 | $ (33,604) | $ 2,155 | $ (20,429) | $ (13,316) | $ 62,857 | $ (5,773) | $ 41,286 |
| **Ending Cash** | $ 10,858 | $ 96,154 | $ 73,248 | $ 14,091 | $ 7,099 | $ 5,662 | $ 79,394 | $ 45,790 | $ 47,946 | $ 27,517 | $ 14,201 | $ 77,058 | $ 71,286 | $ 71,286 |

**Notes:**
(1) assumes filing date of Jun 15, 2020
(2) consolidates cash flows of subsidiary entities
(3) does not include optional, discretionary capex of up to $100k during this period
(4) assumes interest and fees on DIP accrued - may be paid in cash